## SCM CORPORATION

v.

## XEROX CORPORATION.

Civ. No. 15807.

United States District Court,
D. Connecticut.

Dec. 29, 1978.

---

Stephen Rackow Kaye, Ronald S. Rauchberg, Proskauer, Rose, Goetz & Mendelsohn, New York City, Jerome Gotkin, Widett, Widett, Slater & Goldman, P.C., Boston, Mass., Ira B. Grudberg, David Belt, Jacobs, Jacobs & Grudberg, New Haven, Conn., Bernard J. Nussbaum, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Edwin Silverstone, SCM Corp., New York City, for plaintiff.

Stanley D. Robinson, Allen Kezsbom, Gerald Sobel, Fredric W. Yerman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Cummings & Lockwood, Harvey M. Brownrout, Xerox Corp., Stamford, Conn., for defendant.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This case presents important issues concerning the relationship between the patent laws and the antitrust laws. The issues arise in the procedural context of a private treble damage action brought pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and tried to a jury. The factual context is the

1. "SCM" is derived from the initials of the Smith-Corona Company, manufacturer of typewriters, and the Marchant Company, manufacturer of calculators, who merged to form the plaintiff corporation.

2. "Xerox" is derived from the word "xerography"—dry writing—an invented name for the

manufacturing and marketing of office photocopy machines—machines capable of automatically creating copies of an original document.

Plaintiff is SCM Corporation,[1] a conglomerate with annual revenues in excess of $1 billion. During the 1960's SCM was among the world's leading producers of coated paper copiers—machines capable of automatically creating copies of an original document on specially treated paper coated with zinc oxide. In the mid 1970's SCM marketed a plain paper copier, the 6740, which it purchased from the Van Dyk Corporation, and currently markets two models of a plain paper copier manufactured by a Japanese company.

Defendant is Xerox Corporation,[2] a business machines company with annual revenues in excess of $4 billion. In 1960 Xerox brought to market the world's first automatic plain paper copier, the Xerox 914. For the next ten years Xerox and its family of companies were the world's only producers of plain paper copiers. While a competitive plain paper copier was introduced by IBM in 1970 and by numerous manufacturers thereafter, Xerox continues today to be the world leader in plain paper copiers.

The complaint, filed July 31, 1973, alleged that Xerox, acting unilaterally and in concert with other companies, excluded SCM from the field of plain paper copying, causing damages claimed at trial to exceed $500 million. The complaint alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 7 of the Clayton Act, 15 U.S.C. § 18. An amended complaint added allegations of injury to SCM's copier business by Xerox marketing practices in violation of § 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. § 14. In addition to trebled damages, far-reaching equitable relief was sought.[3] A preliminary

process of reproducing images by an electrophotographic process.

3. Other issues raised by the pleadings concerned an SCM claim of invalidity of one Xerox patent, and Xerox claims of patent infringement by SCM. These patent validity and infringement issues have been severed. For pur-

injunction was sought and denied. Pre-trial Ruling No. 6, aff'd, *SCM Corp. v. Xerox Corp.*, 507 F.2d 358 (2d Cir. 1974).

After extensive pre-trial preparations, see *SCM Corp. v. Xerox Corp.*, 77 F.R.D. 10 (D.Conn.1977), jury trial[4] began on June 20, 1977. Fourteen months later, on August 16, 1978, the jury was discharged after returning the last of 54 verdicts. Evidence was presented during 215 days, summations consumed 4½ days, and the jury deliberated for 38 days. The trial transcript totals 46,802 pages.

## I. Basic Claims and Verdicts

### SCM Damage Claims.

SCM presented damage claims in five broad categories: excluding SCM from plain paper copying beginning in 1964; excluding SCM from plain paper copying beginning in 1969; denying SCM the opportunity to market in the United States the Fuji-Xerox 2200 copier manufactured in Japan; impairing SCM's marketing of coated paper copiers by use of two pricing plans known as MUP and XCP; and impairing SCM's marketing of 6740 plain paper copiers by various practices.

The 1964 and 1969 exclusion claims were the heart of SCM's case. SCM alleged, alternatively, that beginning in 1964 or 1969 and continuing until the present, Xerox monopolized the plain paper copier industry and excluded SCM from entering the field. SCM sought the damages it would have avoided if Xerox had not refused SCM's requests in 1964 and 1969 for plain paper copier patent licenses. The 1964 and 1969 exclusion claims each contained three elements of damages: (a) the financial benefits SCM would have achieved, which included net profits through 1976 and net going concern value as of the end of 1976; (b) the actual losses SCM incurred in the placement of coated paper copiers; and (c) the actual losses SCM incurred in the placement of the 6740 plain paper copiers. It was SCM's theory that had it not been excluded from entering into plain paper copying in 1964 and 1969, it would not only have made money, but would have avoided the losses it suffered in its coated paper copier business and in the placement of 6740's.

The presentation of both a 1964 and a 1969 exclusion claim stemmed from a dispute concerning application of the statute of limitations. SCM initially sought patent licenses from Xerox in 1964[5] and annually thereafter at least through 1969. The complaint was filed July 31, 1973. Normally the applicable four-year statute of limitations would apply to bar any cause of action accruing prior to July 31, 1969. 15 U.S.C. § 15b. However, SCM alleged, and Xerox did not dispute, that the limitations period was extended back to January 16, 1969, because (1) on that date the Federal Trade Commission filed a complaint against Xerox alleging monopolization of the plain paper copying field, and (2) the institution of proceedings by the United States suspends the running of the statute of limitations "in respect of every private right of action . . . based in whole or in part on any matter complained of in said proceeding . . . ." 15 U.S.C. § 16(b). Actions initiated by the FTC toll the four-year limitations period. *Minnesota Mining & Manufacturing Co. v. New Jersey*, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). Xerox also raised no

---

poses of all claims put to the jury, SCM assumed the validity of every Xerox patent.

4. The jury, requested by Xerox, was empaneled under an agreed upon procedure whereby 14 persons were selected, none was designated as an alternate, and all remaining at the conclusion of the trial were permitted to deliberate provided at least six remained. Attrition reduced the final jury to nine members.

For an interesting analysis of the composition of the jury and how the demographic characteristics of the final jury was shaped by the selection process, *see* Comment, "Protracted Commercial Litigation and the Seventh Amendment," 10 Conn.L.Rev. 775 (1978).

5. There was a substantial dispute as to whether the SCM license request in 1964 was serious and whether SCM then had the intention, preparedness, and capability to enter the plain paper copying field, an issue ultimately resolved against SCM by the jury (Question 22). But there was no dispute that a license request was made in 1964.

issue concerning the first two weeks of January, 1969; so the parties were in agreement that SCM's 1973 complaint was timely as to causes of action accruing on or after January 1, 1969.[6] The 1969 exclusion claim therefore sought damages SCM alleged it had suffered by being denied patent licenses on or about January 1, 1969.

As an alternative to the 1969 exclusion claim, SCM presented a 1964 exclusion claim for damages allegedly suffered by being denied patent licenses on or about January 1, 1964. SCM contended that the four-year limitations period, as extended back to January 16, 1969, by the FTC complaint, did not bar this claim because, under the principles of *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971), the damages flowing from the 1964 license denial were not ascertainable until after January 16, 1969, and the cause of action based on the 1964 license denial had therefore not accrued until after January 16, 1969.[7]

With respect to both the 1964 and 1969 exclusion claims, SCM estimated its lost profits by presenting elaborate economic models as to what would have happened if it had secured from Xerox plain paper copier licenses on or about January 1 of 1964 and 1969.[8] SCM estimated the types of machines it would have manufactured, the revenues it would have realized, and the costs it would have incurred. Since the 1964 exclusion claim estimated placements and profits over a longer period of time than the period estimated for the 1969 claim, the 1964 damage claim was considerably higher. SCM sought $507 million for the 1964 exclusion claim and $100 million for the 1969 exclusion claim. SCM also sought $12 million for the Fuji-Xerox 2200 claim, $15 million for the MUP and XCP marketing claims, and $4 million for the 6740 marketing claim. SCM also sought trebling of all sums recovered.

*Structure of the Trial.*

The presentation of evidence was divided into three stages. The first stage, which consumed the bulk of the trial, concerned all issues of antitrust violation and the lost profits component of the 1964 and 1969 exclusion damage claims.[9] The second

---

**6.** Though Xerox agreed the complaint was timely with respect to the 1969 exclusion claim as against the defense of limitations, it presented a further defense that SCM's failure to sue at an earlier time rendered all exclusion damages barred under the doctrine of avoidable consequences. *See* note 16, *infra*.

**7.** SCM also contended that the tolling provisions of 15 U.S.C. § 16(b) extended the limitations period back to 1965, when the FTC began its investigation of Xerox. The Court concluded that the filing of the FTC complaint was the earliest relevant date for purposes of § 16(b). *Cf. Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978).

**8.** SCM also contended that it was not limited to exclusion claims measured from either January 1, 1964, or January 1, 1969, but could also seek damages starting at any intermediate point that the jury found warranted by the evidence. This contention became significant when the jury rejected the 1964 claim, leaving only the 1969 claim in issue. The Court ruled that SCM had given the jury evidence of damages flowing from the 1964 license denial and the 1969 license denial, and had failed to present any evidence from which the jury could reasonably estimate what the damages would have been

had SCM obtained patent licenses at some intermediate point. There was no data or opinion evidence that would permit a pro rata award of damages for whatever portion of the 1964 exclusion claim the jury found to be established. SCM's estimates of what would have occurred if it had obtained licenses in 1964 or 1969 differed in fundamental respects. SCM estimated the production of entirely different machines, different market shares, different prices, and different costs. Whether or not the 1964 and 1969 damage estimates were sufficiently non-speculative to permit a damage award, any estimate of damages for a period beginning at an intermediate point would have been wholly speculative.

**9.** The Court permitted evidence of SCM's claimed lost profits to be presented in what was generally the liability phase of the trial because of Xerox's contention concerning SCM's intention to enter plain paper copying. Xerox maintained that SCM did not intend to enter plain paper copying in either 1964 or 1969 and offered to support this contention with evidence that if SCM had entered the field at either date, SCM would have suffered losses. Since the prospect of losses was relevant in determining whether SCM had the requisite intent, the jury, considering the existence of

stage, consuming three days of evidence, concerned the actual loss components (for both coated and plain paper) of the 1969 exclusion damage claim,[10] plus the damage claims based on marketing practices.[11] The third stage, requiring only one day of evidence, concerned the net going concern value component of the 1969 exclusion damage claim.[12]

The Court elected to submit to the jury a large number of interrogatories. This was done, over the plaintiff's objection, for two reasons. First, the sheer volume and complexity of the evidence necessitated focusing the jury's attention on specific issues to be sure that orderly decision-making occurred. Second, the use of numerous interrogatories seemed to offer some prospect of minimizing the risk of retrial. That objec-

tive assumed special importance in this case because of the extraordinary length of the trial and the presence of numerous novel or at least unsettled issues of law.[13] Maximizing jury decision-making remained a principal objective of the Court throughout the trial in order to provide opportunity for particularized appellate review. The interrogatories answered by the jury are set forth in full in Appendix A. Since the 1964 and 1969 exclusion claims raised numerous pairs of identical issues, differing only as to years, many of the questions concerning the 1964 claim were repeated for the 1969 claim, and given the same number but with the addition of an "a."

As with the evidence, the jury's decision-making was divided into stages, but, for reasons detailed in the margin,[14] the divi-

---

intent, was entitled to hear the parties' conflicting claims as to whether SCM would have made profits or suffered losses. All the evidence available at the end of 1976 and offered to show whether entry in 1964 or 1969 would actually have produced profits would not have been available in 1964 or 1969 to estimate prospectively the likelihood of profits. However, there was substantial overlap between the bases for estimates available to be made prospectively in 1964 and 1969 and for estimates to be made retrospectively in 1976. Therefore, Xerox was given an opportunity to prove that losses would have occurred, so that it could contend that the prospect of such losses would have deterred SCM in 1969 from entering plain paper copying if licenses were available.

10. SCM claimed $40.5 million for actual losses.

11. Since the jury at the end of the first stage rejected SCM's claim concerning the Fuji-Xerox 2200 and the 6740 marketing claim, no evidence was presented concerning the amount of damages on these claims. The jury's findings in favor of SCM concerning the MUP and XCP pricing claims led to the presentation of damage evidence on these claims. In addition, the Court concluded, contrary to the position taken when the first stage was concluded, to permit the jury to consider evidence of the component of SCM's 1969 exclusion claim concerning actual losses in the placement of 6740's. This is not the 6740 marketing claim rejected by the jury in the first stage. That claim concerned Xerox practices alleged to impair SCM's ability to place 6740's. The 6740 actual loss claim was that if SCM had been granted plain paper copier patent licenses in 1969, it would not have embarked on the 6740 program at all in the 1970's and thereby avoid-

ed all the actual losses it sustained in that venture.

12. SCM claimed $48.2 million for loss of net going concern value. The Court separated evidence of the net going concern value damages into a third stage of the trial to avoid the risk of prejudice to Xerox when the jury considered the amount of lost profits under the 1969 exclusion claim. Since the net going concern value claim was of exceedingly doubtful validity, it seemed advisable to avoid the risk that the jury might assess that claim and the lost profits claim together and reach a compromise that might be based on an invalid theory.

13. See Vandercook & Son, Inc. v. Thorpe, 344 F.2d 930, 931 n. 2 (5th Cir. 1965), indicating "the desirability of using special interrogatories under Fed.R.Civ.P. 49(a) with a general charge where distinctive, or doubtful (or both), theories are at issue, or where the law is in a state of flux." See generally, Brown, "Federal Special Verdicts: The Doubt Eliminator," 44 F.R.D. 338 (1967).

14. Three differences should be noted. First, though the evidence concerning the amount of lost profits in the 1969 exclusion claim was presented in the first stage, the decision-making as to quantification of this component of the 1969 exclusion claim occurred at the end of the second stage. (Questions 50 and 51). See footnote 9, supra. Second, though evidence of proximate cause was presented in the first stage, decision-making on several proximate cause issues was deferred until the second stage so that the jury would have evidence of the amount of damage when deciding whether any damages were proximately caused by

sion of jury decision-making differed slightly from the division of evidence. Initially 76 questions were submitted to the jury at the conclusion of the first stage of evidence. The jury was instructed first to answer the four questions concerning the relevant product markets (Questions 1, 1a, 2, and 2a) and report their verdicts on these issues before proceeding further. The jury's verdicts on the product market issues, agreeing with SCM's contentions as of 1969, but not as of 1964, prompted the Court to withdraw from the jury's consideration nine questions dealing with the 1964 exclusion claim. Since some of the remaining questions were to be answered only if a "yes" answer were given to preceding questions, the jury answered 44 questions at the end of the first stage. One aspect of the jury's responses, discussed at pages 1009–1010, *infra*, prompted the Court to submit two additional questions (Questions 24a–1 and 27a–1). In the second stage, the jury was given 11 questions, concerning some issues of proximate cause and quantification of damages. Because of some negative answers, the jury answered seven questions of this group. In the third stage only a single question was asked and answered. This concerned quantification of the net going concern value component of the 1969 exclusion claim.

*Jury's Verdicts on SCM's Damage Claims.*

The jury's verdicts were in favor of SCM on some parts of two of the five damage claims, but also in favor of Xerox on one of its defense contentions. As to the 1964 exclusion claim, the jury rejected SCM's contentions concerning the relevant market or sub-market as of 1964. (Questions 1 and 2). SCM had contended that there existed by 1964 a relevant market consisting of "convenience office copiers" using both plain and coated paper and a relevant sub-market consisting of "convenience office copiers" using only plain paper. "Convenience office copiers" meant copying machines suitable for automatic use in offices but not including spirit duplicators, mimeograph machines, or offset machines. Xerox defined the relevant market to include spirit, mimeo, and offset, with offset included to the extent that the machines were used for run lengths of less than 200 copies from an original.

Despite the jury's rejection of SCM's market definitions as of 1964, the jury was asked several questions concerning other aspects of the 1964 claim.[15] The jury concluded that SCM had not proved that in 1964 it

wrongful conduct. Proximate cause issues submitted to the jury in the second stage concerned the MUP and XCP pricing plans (Questions 52, 54, and 57) and the 6740 actual loss component of the 1969 exclusion claim (Question 59). Third, though evidence concerning the XCP pricing plan was presented in the first stage, the violation questions submitted to the jury at the end of the first stage concerning the pricing plan issues (Questions 43–47) and the jury's responses left in doubt the jury's view of the XCP plan. Therefore, a separate question as to whether the XCP plan was a law violation was submitted at the end of the second stage (Question 56).

**15.** The substantive questions concerning some aspects of the 1964 exclusion claim were submitted to the jury, notwithstanding the jury's rejection of SCM's 1964 relevant market contentions, for two reasons. First, additional fact-finding by the jury offered the prospect of determining whether necessary elements of the 1964 exclusion claim were established wholly apart from the relevant market contentions. As it happened, the negative answer concerning SCM's intention, preparedness, and capability to enter plain paper copying in 1964 eliminated the 1964 claim, regardless of the relevant market issues and regardless of any SCM contention concerning the correctness of the charge on issues of violation. Second, this course created the opportunity to secure additional jury fact-finding in the event a reviewing court were to disagree with the relevant market findings as a matter of law. Had the jury found in favor of SCM on the intention element and also on the questions to be answered if intention had been proven, the Court would then have had the opportunity, after all other fact-finding was completed (when no prejudice to other fact-finding could be claimed), to ask the jury to answer the withdrawn 1964 violation questions on the assumption that the relevant market as claimed by SCM existed in 1964. The appropriateness of what amounts to hypothetical jury fact-finding is of course open to question, but it is not without some precedent, see *Foster v. Maldonado*, 433 F.2d 348 (3d Cir. 1970) (jury told to assess wrongful death damages under two alternative rules of law where choice of law rule is uncertain); *United States v. 371.94 Acres of Land*, 431 F.2d 975, 978 n. 3 (6th Cir. 1970) (jury returned alternative verdicts on land valuations using different

had the intention, preparedness, and capability to enter into plain paper copying. (Question 22). That negative answer totally rejected the 1964 exclusion claim, regardless of any claim SCM may have that a relevant market or sub-market existed by 1964 as a matter of law.

As to the 1969 exclusion claim, the jury upheld SCM's relevant market contentions as of 1969 (Questions 1a and 2a), found violations of § 2 of the Sherman Act (Question 4a), § 1 of the Sherman Act (Question 15a), and § 7 of the Clayton Act (Questions 20 and 21a), and found that Xerox conduct in violation of the antitrust laws was a proximate cause of SCM's not entering into plain paper copying in 1969 (Questions 24a and 27a). As to the lost profit component of the 1969 exclusion claim, the jury concluded that SCM suffered damages of $11.5 million in cumulative lost profits from 1969 to 1976 (Question 50) and $25.6 million in loss of net going concern value as of the end of 1976 (Question 61). However, the jury also upheld Xerox's defense contention that SCM should reasonably have avoided all the 1969 exclusion claim damages by pursuing earlier litigation against Xerox (Question 34).[16] The jury rejected the two components of the 1969 exclusion claim concerning SCM's actual losses in coated paper copying (Question 32a) and actual losses in the placement of 6740 plain paper copiers (Question 59), finding that SCM had not

proved that these losses were proximately caused by SCM's exclusion from plain paper copying in 1969.

As to the MUP and XCP marketing claims, the jury found that MUP violated § 2 of the Sherman Act (Question 45) and § 3 of the Clayton Act (Questions 43 and 44), that the MUP pricing plan was a proximate cause of SCM's not placing some coated paper copiers (Question 52), and that SCM thereby suffered $230,874 of damages (Question 53). As to the Fuji-Xerox 2200 claim, the jury found that there had been no violation of § 1 of the Sherman Act as alleged by SCM (Question 38) and that SCM had not proved its intention, preparedness, and capability to market the 2200 (Question 41), thereby totally rejecting this claim. As to the 6740 marketing claim, the jury found no marketing practices in violation of § 2 of the Sherman Act affecting 6740 placements as alleged by SCM (Question 48), thereby totally rejecting this claim.

The issue currently before the Court is what money judgment, if any, should be entered upon the jury's verdicts.[17] The broad questions are whether in view of the verdicts, both those favoring SCM and those favoring Xerox, there is a lawful basis for SCM to recover $11.5 million in lost profits and $25.6 million in lost net going concern value on the 1969 exclusion claim and $230,874 in coated paper copier losses

---

factual assumptions), and would certainly have been worth the additional few days of jury time in order to try to avoid retrial in a case of such extended length.

16. Xerox made two contentions to the jury concerning its defense of avoidable consequences. First Xerox contended that SCM could reasonably have avoided all 1969 exclusion damages by litigating Xerox's right to maintain its patent portfolio unlicensed in 1963. At that time, Xerox had sued SCM for patent infringement with respect to SCM's coated paper copiers, and SCM had counterclaimed for a declaration that Xerox's patents were unenforceable by reason of antitrust law violations, substantially the same contention urged in this suit. The 1963 lawsuit was settled without prejudice with SCM taking licenses for coated paper copier applications. Xerox urged the jury to find in this suit that if its patent portfolio was unenforceable because of antitrust vio-

lations as SCM claimed, SCM could have avoided all its exclusion claim damages by continuing the 1963 suit or initiating a new suit in 1964. The jury's answer to Question 34 upheld this defense.

Xerox also contended that, if its conduct violated the antitrust laws and made its patents unenforceable, SCM could reasonably have avoided all exclusion damages by determining for itself that the Xerox patents were unenforceable and entering into plain paper copying with the confidence that Xerox infringement suits would be unsuccessful. The jury rejected this defense (Question 33).

17. The parties and the Court have agreed that consideration of any entitlement to equitable relief and to attorney's fees should be deferred until after appellate review of a judgment, entered pursuant to Fed.R.Civ.P. 54(b), adjudicating the claims for money damages.

on the MUP marketing claim, and whether any sums awarded are to be trebled. Consideration of these questions requires a detailed consideration of the evidence.

## II. *The Evidence*

*Xerography.*

In the 1930's Chester Carlson, working as a patent attorney, turned his inventive mind to the task of discovering a technique for copying documents that would be an improvement over photography and its variant, photostating. In a truly creative feat of invention, he conceived of the process of electrophotography, adapting the principles of electrostatics to the reproduction of images. What Carlson invented was a process, later named xerography, which, as ultimately perfected, consisted of several steps. First, an electrostatic charge is placed on a photoconductive surface, *i. e.*, a surface that will retain an electrical charge in the dark and lose it when exposed to light. After this charging step, the photoconductive surface is exposed by reflecting light against the image to be copied onto the photoconductive surface. The white portions of the image reflect the light, and these reflections discharge the electrostatic charges on the photoconductive surface at the points receiving light. The black portions of the image (typewriting on a document) do not reflect the light. The result is that electrostatic charges remain on the photoconductive surface in a pattern equivalent to the image to be copied. This pattern of invisible electrostatic charges is then developed by bringing particles of toner (the equivalent of ink in conventional printing) into contact with the photoconductive surface. The toner particles are given an electrostatic charge opposite to the charge of the photoconductive surface so that the particles cling to the surface wherever an electrostatic charge remains, thus forming a pattern of toner equivalent to the image to be copied. The surface on which the copied image is to appear, usually a sheet of plain paper, is then brought into contact with the photoconductive surface. An electric charge behind the paper, opposite to the charge of the toner particles, causes the particles to transfer to the paper, maintaining on the paper the same pattern they formed on the photoconductive surface. The toner particles are then fused to the paper by heat or pressure to fix them permanently on the surface of the paper, completing the creation of a copy of the original image.

The process just described is xerography in the reusable mode, that is, the photoconductive surface can be cleaned, and used over and over again for the cycle consisting of charging, exposing, developing, transferring, fusing, and cleaning. The process is to be contrasted with electrofax or zinc oxide copying, in which a sheet of paper coated with zinc oxide serves as the photoconductive surface. In this latter process, charging, exposing, developing, and fusing occur, but there is no transfer or cleaning. The image to be copied appears on the sheet of coated paper. Coated paper copying requires a less complicated and less expensive machine than plain paper copying, although the cost of supplies is higher, since coated paper costs more than plain paper. If the costs of machine and paper are considered together, customers pay more for making a single copy on plain paper than on coated paper, but the plain paper process becomes cheaper than coated paper when large quantities of copies are made.

The distinction between uses of xerography for plain and coated paper copying is important to understanding the issues in this case. From the time it introduced the world's first automatic plain paper xerographic copier in 1960 until 1970, when IBM brought out its competing plain paper copier, Xerox was the world's only maker of plain paper copiers. SCM was licensed by Xerox to use xerographic patents for coated paper copying, but was never granted licenses for plain paper copying. The exclusion claim damages in this suit are the damages SCM contends it would not have suffered had Xerox granted SCM plain paper copier patent licenses in 1969. Assessing the claim requires explanation of what happened to the xerographic process after its basic concept was originated by Carlson.

Initially, it must be realized that Carlson had only a concept, albeit an extraordinary one. Using crude materials, he was able in 1938 to develop a barely readable image on a photoconductive surface. He thereby demonstrated the potential use of his concept, but it would be 22 years before an automatic machine would reduce his concept to practice suitable for convenient use in an office at the push of a button.

*Carlson-Battelle Relationship.*

Sharing the frustrations and initial fate of many inventors, Carlson made extensive efforts to interest business machine companies in the development of his invention. No commercial enterprise offered to invest any money. Ultimately Carlson stirred the interest of the Battelle Memorial Institute (Battelle) of Cleveland, Ohio, a non-profit research institute. In 1944 Carlson and Battelle concluded an agreement whereby Carlson designated as his agent for licensing the Battelle Development Corp., a wholly owned subsidiary of Battelle, and received the right to 40% of any royalties that Battelle might earn from licensing the patents. Later Carlson formally assigned his patents to Battelle, retaining the right to 40% of royalties.

*Battelle-Xerox Relationship.*

Battelle proceeded to work on the xerographic process, inventing many features that ultimately proved indispensable to the creation of an automatic machine. Initially Battelle fared no better than Carlson had in interesting any commercial enterprise to sponsor research in exchange for a license. In 1946 the Haloid Company of Rochester, N.Y., (as Xerox was then known) contacted Battelle and offered to negotiate an agreement. The result was not only a business relationship that was to launch one of America's foremost episodes of corporate success, but also a set of legal relationships that are central to SCM's claims in this case.

The first agreement between Battelle and Haloid (PX 103) was entered into in 1947. It provided that Battelle would license Haloid to use the Carlson patents and any new Battelle patents concerning electrophotography. The license covered equipment for the reproduction of documents, but excepted equipment designed to make more than 20 copies of an original. The license was described as non-exclusive and non-assignable. However, the agreement also specified circumstances under which Battelle would not license anyone else to use the patents for copying equipment, except for equipment designed to make more than 20 copies of an original. Haloid agreed to pay Battelle an 8% royalty, with a modest minimum royalty provision, and also agreed to sponsor research at Battelle in the amount of $25,000 per year.

A second agreement (PX 268) was entered into in 1948. It changed the '47 agreement in several respects. The less-than-20-copy limitation was dropped, and Haloid's license covered virtually all applications of xerography. The license was exclusive, replacing the prior arrangement of a nonexclusive license that became exclusive under specified circumstances. Haloid obtained the right to sub-license and agreed to pay Battelle 62½% of all sub-license royalties. Haloid's royalty rate on its license from Battelle remained at 8%, though the minimum payment was increased. Haloid agreed to use diligent efforts to secure sub-licensees to engage in research, development, and commercialization of the licensed patents. The sub-licensing was to be on terms mutually agreeable to Haloid and Battelle. In the event of disputes concerning sub-licensing, Haloid was given final authority with respect to sub-licensing for document reproduction equipment, except for equipment designed to reproduce more than 20 copies of an original. Final authority on sub-licensing for more-than-20-copy reproduction equipment and for all other xerographic equipment was given to Battelle.

A third agreement (PX 187) was entered into in 1951. It eliminated all exclusions from Haloid's exclusive license, extended the territorial scope of the exclusive license world-wide, and further increased Haloid's

minimum royalty payment. Haloid's 8% royalty rate on its license and 62½% rate on sub-licenses were continued, as was the Haloid "diligent efforts" undertaking concerning sub-licensing.

A fourth agreement (PX 187) was entered into in 1956. Before considering its terms, the business context must be understood. In the 1950's work by Battelle and Xerox resulted in a machine capable of using the xerographic process to produce a copy of an original document. The machine was not automatic. It required the several steps of the xerographic process to be taken separately, over a span of about 4 minutes. This machine, known as flat plate equipment, was not suitable for use in offices, but it did produce a copy of an original suitable for use as an offset master. The machine enjoyed modest commercial success. Subsequently there was developed the copy-flo machine, a device that used the xerographic process to copy images from microfilm onto a roll of plain paper. Though unable to make single or multiple copies of a single original document onto cut sheet paper, the copy-flo machine was successful as a device for customers who wanted microfilm "printed" more quickly and less expensively than by traditional photographic enlargement.

The advent of these commercially successful uses of xerography produced considerable income to Xerox (as the company was then called) and consequent royalty obligations from Xerox to Battelle. By 1956 40% of Xerox's profits were derived from xerographic products. The large and increasing revenues obtained by Xerox was one consideration that prompted Xerox to renegotiate its arrangement with Battelle.

Under the 1956 Xerox-Battelle agreement, Xerox in effect replaced the arrangement whereby it paid for an exclusive license in cash royalties with an arrangement whereby it acquired the patents in exchange for Xerox stock. Battelle thereby benefited from the success of xerography by the appreciation of Xerox stock instead of by receiving royalty income. The agreement reached this result in stages. Initially

Xerox acquired the four basic Carlson patents and, in 1959, the rest of Battelle's xerographic patents. Xerox transferred to Battelle 55,000 shares of Xerox stock. Xerox's royalty obligation was considered paid up for 1956–1958, and for 1959–1965 was reduced to 3% on sales up to $20 million and 1% on sales above $20 million. After 1965 the royalty obligation ended. Xerox also acquired the right to receive all future xerographic patents and technology developed by Battelle as long as Xerox sponsored research at Battelle in an amount of at least $25,000 per year. By acquiring title to the Carlson and Battelle patents, Xerox extinguished whatever obligation it had under the prior agreements to seek sub-licensees.

*Xerox's Foreign Relationships.*

In view of SCM's claims based on concerted action by Xerox and others, it is necessary to sketch briefly Xerox's arrangement for foreign exploitation of xerography. In 1956, Xerox and the Rank Organisation of London formed a joint venture known as Rank-Xerox. Xerox assigned all foreign patents to Rank-Xerox, and Rank agreed to invest $600,000 in the new venture. Xerox and Rank each owned 50% of the stock of Rank-Xerox, though profits, after return of Rank's investments were divided ⅔ to Xerox and ⅓ to Rank. In 1959 Rank-Xerox and Fuji Photo Film of Tokyo formed a joint venture known as Fuji-Xerox to exploit xerography in Japan and other parts of the Far East. In 1969 Xerox purchased from Rank a 1% interest in Rank-Xerox, thereby becoming a 51% owner of Rank-Xerox and a 25.5% owner of Fuji-Xerox.

*Success of Plain Paper Copiers.*

With the introduction of the first automatic plain paper copier in 1960, Xerox enjoyed phenomenal commercial success. Revenues increased from $47 million in 1960, to $383 million in 1965, to $1.7 billion in 1970, and to more than $4 billion by 1975. Profits before taxes increased from $6 million in 1960, to more than $100 million in 1965, to more than $400 million in 1970, and to more than $800 million by 1975. For ten

years after 1960 Xerox and its affiliated companies manufactured the only plain paper copiers in the world. IBM entered the field in 1970, as did other companies in the early 1970's. All were sued by Xerox for patent infringement.

*Federal Trade Commission Proceeding.*

The final aspect of the factual context is the activity of the Federal Trade Commission. On January 12, 1969, the FTC filed a complaint against Xerox, charging monopolistic practices and seeking broad equitable relief including compulsory licensing of Xerox patents and termination of the relationships between Xerox and its affiliated companies. That proceeding terminated with the entry of a consent decree on July 29, 1975. Under the decree (Court Ex. 135) Xerox offered non-exclusive licenses under any three of its plain paper copier patents at no royalty and under all of its patents at nominal royalties of ½ of 1% per patent up to a maximum of 1½% for any one product, plus the right to a grant-back of non-exclusive licenses on all xerographic patents of a licensee. Though initially excluded from the evidence in this case, the basic provisions of the FTC decree were ultimately admitted (Tr. 17,840–41) as a result of Xerox's contentions and lines of attack developed in cross-examination (Tr. 11,116–26).

### III. *The 1969 Exclusion Claim*

*SCM's Theories of Liability.*

SCM grounded its exclusion claim on several theories of antitrust law violation. Though entertaining grave doubts as to several of SCM's theories, the Court concluded that a trial would be necessary in any event because of the allegation that Xerox entered into an agreement with Battelle, Rank, Rank-Xerox, Fuji, and Fuji-Xerox, or some of them, to refuse to license xerographic patents for plain paper uses to anyone other than the companies within the Xerox family of related companies. This claim appeared to state a classic concerted refusal to deal in violation of § 1 of the Sherman Act.[18] See *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Whether the other theories were tenable legal theories were matters on which the parties sharply disagreed, but on which they could offer scarcely any authoritative precedent either way. Faced with the prospect of a long trial to adjudicate an entirely valid legal claim, the Court concluded that the jury should be given the task of doing whatever fact-finding might reasonably be required to afford this Court and any reviewing court the opportunity to rule on the validity of SCM's other theories of liability. Neither at the outset, nor in retrospect, did

**18.** The parties disputed whether a § 1 violation could be based on an agreement between entities in the relationship of the members of the Xerox family of companies. SCM contended that an agreement can violate § 1 if made by any two separate entities, regardless of whether they are actual or potential competitors and regardless of their inter-corporate affiliation. Reliance was placed on cases such as *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), and *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Xerox contended that a § 1 violation cannot exist in the absence of an agreement between parties who are actual or potential competitors and hold themselves out as such. Reliance was placed on *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 45 L.Ed. 41 (1975), and *Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321 (E.D.N.Y.1970), *aff'd,* 451 F.2d 593 (2d Cir. 1971).

To provide a factual predicate for resolving the dispute as to whether parties to a § 1 agreement must be actual or potential competitors, the jury was asked questions about the competitive status of some of the entities involved. SCM made no claim that the entities were in actual competition; so the questions asked whether the entities were potential competitors as of certain pertinent dates. SCM made no claim that Battelle was a potential competitor of Xerox's. The jury concluded that Xerox and the Rank Organisation were not potential competitors in 1956 when Rank-Xerox was formed (Question 12), that Fuji Photo Film was a potential competitor of either Xerox or Rank-Xerox in 1960 when Fuji-Xerox was formed (Question 13), and that Xerox, Rank-Xerox, and Fuji-Xerox were not potential competitors in either 1964 or 1969, when SCM claimed concerted license denials (Questions 14 and 14a).

it seem that very much additional evidence would be presented to support the additional theories beyond the proof relevant to a claim of concerted refusal to license. Moreover, SCM's marketing claims required jury consideration of whether Xerox had monopoly power in a relevant market, an issue that assured extensive presentation of evidence, regardless of whether the additional theories of liability for not licensing were tenable.

The SCM theories of liability with respect to the exclusion claim and the jury's responses on those they considered may be summarized as follows. First, as mentioned, SCM claimed a concerted refusal to deal with respect to plain paper copier patented and unpatented technology in violation of § 1. SCM contended that two agreements existed among Xerox and the members of its family of companies: an agreement to exclude other companies from the manufacturing and marketing of plain paper copiers throughout the world, and an agreement to deny other companies licenses to use plain paper copier patents throughout the world. The jury found that SCM had not proved the existence of either agreement as of 1964 or 1969.[19] (Questions 18, 16, 18a, and 16a).

SCM also contended that Xerox possessed monopoly power in a relevant market and sub-market and had willfully acquired or maintained such power in violation of § 2 of the Sherman Act. SCM urged the Court to charge the jury that a company that willfully acquires or maintains monopoly power is liable for damages when it refuses to license its patents. (SCM request to charge No. § 2–64). The Court submitted to the jury questions concerning the elements of a § 2 violation, but declined to instruct as requested concerning SCM's view of the consequence of a § 2 violation, believing that the theory, if valid, could be supported by subsidiary findings without its explicit submission to the jury. The jury found that in 1969, but not in 1964, there existed a relevant market, as alleged by SCM, consisting of convenience office copiers using both plain and coated paper, and a relevant sub-market, as alleged by SCM, consisting of convenience office copiers using only plain paper. (Questions 1, 1a, 2, and 2a). The jury also found that as of 1969 Xerox had monopoly power in the relevant market and in the relevant sub-market. (Question 3a). Xerox conceded that if there was a relevant plain paper sub-market, which it disputed, its 100% share gave it monopoly power. The jury also found that as of 1969 Xerox willfully acquired or maintained monopoly power in both the convenience office copier market and the plain paper copier sub-market (Question 4a), thereby finding all the elements of actual monopolization in violation of § 2.[20]

19. SCM contended that the § 1 finding of no agreement to exclude others from plain paper copying (Questions 18 and 18a) was inconsistent with the § 2 finding that as of 1969 there existed a conspiracy among Xerox, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox to acquire or maintain monopoly power in the convenience office copier market and plain paper copier sub-market (Question 9a). SCM urged that since the power to exclude is a test of monopoly power, the conspiracy finding necessarily meant that the Xerox companies agreed to acquire or maintain the power to exclude, which, SCM contended, was the equivalent of agreeing to exclude. Xerox replied that no inconsistency necessarily existed, in light of Xerox's argument to the jury. Xerox had contended primarily that there was no conspiracy to acquire or maintain monopoly power, but had also urged, alternatively, that if such a conspiracy existed, it was limited to an agreement to allocate world-wide territories among the Xerox companies and thereby exclude only the Xerox companies from specified territories of the world. If the jury based its conspiracy finding on this aspect of the companies' arrangement, Xerox contended, the finding did not indicate an agreement to exclude all others from plain paper copying. (Tr. 44,631–36). The Court declined to find that the verdicts were inconsistent. (Tr. 44,645–46).

20. SCM also contended that Xerox violated § 2 by attempting to monopolize and conspiring to monopolize. The jury found that Xerox was a member of a conspiracy to monopolize the relevant markets as of 1969 (Question 9a), but rejected SCM's contention that Xerox had the specific intent to acquire or maintain monopoly power (Questions 7a and 10a), thereby rejecting a necessary element of both the attempt and conspiracy violations of § 2.

SCM also alleged violations of § 1 of the Sherman Act and § 7 of the Clayton Act, based on the 1956 agreement between Xerox and Battelle. While SCM alleged that numerous other Xerox agreements and acquisitions violated §§ 1 and 7, and that these violations showed that Xerox's monopoly power was willfully acquired or maintained, it was the 1956 Battelle agreement on which SCM based a specific claim of injury proximately caused by violations of §§ 1 and 7. But for that agreement, SCM contended, it would have obtained plain paper copier patent licenses "effected by Battelle," SCM Exclusion Claim Br. 7, presumably on the theory that Battelle would have insisted that Xerox sub-license under the exclusive licenses Xerox already held. The jury found that as of 1964 and 1969 the 1956 Xerox-Battelle agreement was an unreasonable restraint of trade. (Questions 15 and 15a). With respect to the § 7 claims, SCM alleged that Xerox's acquisition of patents from Battelle in 1956 had the probable effect of substantially lessening competition or tending to create a monopoly in both the convenience office copier market and the plain paper copier sub-market. The jury agreed. (Question 20). SCM also contended that in both 1964 and 1969 the probable effect of Xerox's continued holding of patents acquired pursuant to the 1956 Xerox-Battelle agreement was substantially to lessen competition or tend to create a monopoly in the convenience office copier market and the plain paper copier sub-market. The jury agreed as of both dates. (Questions 21 and 21a).

SCM also alleged that liability could be predicated upon § 2 of the Sherman Act on the theory that plain paper copiers were an essential product, and a company with monopoly power with respect to such a product is obligated to afford other manufacturers an opportunity to make and market the product. Reliance was placed on cases such as *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Terminal Railroad Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Hecht v. Pro-Football, Inc.,* 187 U.S.App.D.C. 73, 570 F.2d 982 (1977); *Gamco v. Providence Fruit & Produce Bldg., Inc.,* 194 F.2d 484 (1st Cir. 1952). The Court declined to submit this theory to the jury.

Since SCM's 1969 exclusion claim is a claim for the damages SCM suffered because Xerox did not grant SCM plain paper copier patent licenses in January, 1969, one might reasonably expect the legal issues to be limited to whether Xerox had a duty to license. While SCM contends Xerox did have such a duty, its primary position is that a damage award is proper, based on the jury's verdicts, wholly apart from a Xerox duty to license. As SCM sees it, "[i]t is irrelevant whether Xerox's refusal to license was an illegal act or whether Xerox had a duty under the antitrust laws to license the acquired patents to others." (SCM Exclusion Claim Br. 7). In SCM's view it has been excluded from plain paper copying, and this "exclusion" is not just a refusal to license.

### Relationship Between Patent and Antitrust Laws.

Before considering the validity of SCM's theories concerning the 1969 exclusion claim, a preliminary look is appropriate at the relationship between the antitrust laws and the patent laws. Ever since the King's Bench considered a patent-antitrust conflict in 1602 in the first reported case on the subject,[21] the issues arising in this field have yielded few clear or satisfying answers.[22]

Economic arguments can be made that these statutes have a common goal of maximizing wealth by facilitating the production of what consumers want at the lowest cost. See W. Bowman, *Patent and Anti-*

---

**21.** *Darcy v. Allein,* 77 Eng.Rep. 1260 (K.B. 1602).

**22.** As Prof. Stedman has observed, "Few areas of the law can match the patent-antitrust issue in terms of the spate of questions that have been posed and the inconclusiveness of the answers that have been given." Stedman, "Patents and Antitrust—The Impact of Varying Legal Doctrines," 1973 Utah L.Rev. 588.

*trust Law* 1 (1973). Whatever their economic congruency, there can be little doubt these two sets of laws are juridically divergent. The antitrust laws condemn monopoly, and "the very object" of the patent laws "is monopoly." *Bement v. National Harrow Co.,* 186 U.S. 70, 91, 22 S.Ct. 747, 46 L.Ed. 1058 (1902). The patent monopoly is an "exception to the general rule against monopolies," *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945).

Of course the holder of patent rights is not immune from the antitrust laws as countless cases illustrate. *E. g., United States v. Singer Mfg. Co.,* 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 832 (1963); *United States v. New Wrinkle, Inc.,* 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417 (1952); *United States v. Line Material Co.,* 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948). And it is equally clear that a patent is a "species of property," *Transparent-Wrap Machine Corp. v. Stokes & Smith Co.,* 329 U.S. 637, 643, 67 S.Ct. 610, 91 L.Ed. 563 (1947), and that its use, like that of other property, can violate the antitrust laws. *E. g., United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944). But a patent is not just like any other type of property. The holder of an ordinary chattel can normally enjoy its exclusive use but he has no protection whatever from any other person who discovers or creates an identical item and uses that item for economic gain. However, the holder of a patent, in addition to the usual incidents of property ownership, enjoys for the 17-year term of his statutory monopoly, the exclusive power to prevent anyone else from using the patented invention for economic gain, even a person who discovered or created the invention entirely independent of the patent owner. The patent laws grant this broad exclusionary power for a limited time to provide an incentive for research investment[23] and to secure the public benefit of full disclosure of the patented invention.

This broad power to exclude, broader than the power enjoyed by the owner of ordinary property, is what requires an accommodation between the patent laws and the antitrust laws. The monopoly power condemned by § 2 of the Sherman Act is the power to exclude competition from a relevant market, *United States v. DuPont & Co.* (cellophane), 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), yet the power to exclude is precisely the power granted by the patent laws. And the patent laws place no limitation on the granted power to exclude even when the patented invention is used in a product that creates and defines its own relevant market. In determining when use of a patent can violate the antitrust laws, courts obviously cannot focus on the patent owner's power to exclude without ignoring a core concept of the patent laws.

The cases upholding antitrust violations by holders of valid patents,[24] despite the insulation of the patent laws, have generally done so upon a finding that the patent holder misused the patent to extend his monopoly beyond the statutory grant, *e. g., Mercoid Corp. v. Mid-Continent Investment Co., supra* (requiring purchase of unpatented product to obtain patented product), or that the patent holder abandoned his freedom to decide unilaterally whether or not to permit use of his patented invention and instead agreed with others not to permit licensing at all or do so only on restricted terms, *e. g., Zenith Radio Corp. v. Hazeltine Research, Inc., supra* (concerted refusal to license except on restricted terms). While normally not characterized as such, the con-

---

23. As Judge Frank has observed, the protection offered by the patent laws may really be needed as an incentive to the investor, not the inventor. *Picard v. United Aircraft Corp.,* 128 F.2d 632, 642 (2d Cir. 1942) (concurring opinion).

24. This case raises no issue concerning antitrust violations based on anti-competitive uses of patents obtained by fraud upon the Patent Office. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

certed refusal to license cases may themselves be viewed as prohibitions against extension of the statutory patent monopoly: the patent laws give the patent owner the power to exclude, but once he makes an agreement with others not to license the patent, the patent monopoly has in a sense been extended because the power to exclude has now been given to those who derived no power from the patent itself.

Thus the patent misuse cases and the concerted refusal to license cases may be viewed as holding no more than that a patent holder violates the antitrust laws when he extends his patent monopoly, and conversely he is immune from antitrust liability when he does no more than maintain his patent monopoly. But other developments in the field indicate that the antitrust laws might limit a patent holder who does not seek to extend his patent monopoly either by techniques normally characterized as patent misuse or by a concerted refusal to license. The principal example is a requirement of prospective compulsory licensing to remedy the effects of an adjudicated antitrust violation, *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), aff'd, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

Also of significance are the occasions when a company holding an accumulation of patents that dominate an industry has voluntarily agreed to license its patents in the face of an allegation of antitrust law violation. *E. g., United States v. International Business Machines Corp.*, 1956 CCH Trade Cases ¶ 68,245 (S.D.N.Y.1956); *United States v. Radio Corporation of America*, 1958 CCH Trade Cases ¶ 69,164 (S.D.N.Y. 1958). Indeed, the evidence in this case disclosed that the prospect of one day being required to license its patents was fully apprehended by Xerox's leadership. In 1969 Xerox's president observed, "It's clear that we don't want to license until we have to . . . ." (Tr. 9,573–74). Ultimately, in 1975, in the face of antitrust allegations brought by the Federal Trade Commission, Xerox did agree to a consent decree requiring patent licensing at nominal royalties.

Of course the IBM, RCA, and Xerox prospective licensing consent decrees are not adjudications of a duty to license, but they are strong indications of a reasonably held apprehension that an appropriate way to harmonize the prohibitions of the antitrust laws with the protections of the patent laws is to require prospective licensing of patents when a company's patent structure threatens undue maintenance of industry domination.

Of equal interest in assessing the extent of patent law protection is the absence of any reported decision in which a patent holder has been held liable to pay money damages, for a unilateral refusal to license patents, as compensation to a potential competitor for the profits that would have been earned if licensing had occurred. Just as the consent decrees do not establish an obligation to license prospectively, the absence of damage awards does not preclude retrospective liability for failure to license. However, both circumstances illuminate the context in which the issues arising under SCM's 1969 exclusion claim must be resolved. In particular, they indicate that the need to harmonize the purposes of the patent and antitrust laws may well require recognition that some patent-related conduct creates antitrust liability only for prospective equitable relief, but not for treble damage remedies, at least in some circumstances.

Other approaches have been urged that result in a distinction allowing prospective equitable remedies while denying retrospective damage remedies. Xerox puts the argument on constitutional grounds, suggesting that even if prospective licensing were warranted, the imposition of damage liability for a unilateral refusal to license valid patents would be an "avulsive change" in the law, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 499, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), of which there was no "fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). *Hanover Shoe* found it unnecessary to consider the argument since the finding of violation was deter-

mined not to be "a sharp break in the line of earlier authority." 392 U.S. at 499, 88 S.Ct. at 2234. See also *Berkey Photo, Inc. v. Eastman Kodak Co.,* 457 F.Supp. 404, 436–40 (S.D.N.Y.1978).

A second approach achieves the distinction with respect to a plaintiff who has no share of the market from which he alleges exclusion. He may be denied a damage remedy because his damage estimate is too speculative even under the generous standards of *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). See, *e. g., Flintkote Co. v. Lysfjord,* 246 F.2d 368, 389–94 (9th Cir. 1957). That is apparently the approach favored by Profs. Areeda and Turner. *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (1978) (hereafter *"Antitrust Law"*). Having emphasized the frequently speculative nature of damages claimed by a would-be market entrant, II *Antitrust Law, supra,* § 344c, they then consider only equitable relief as a remedy for § 2 violations involving unlawful exclusionary use of patents, *id.* at § 705h.[25]

A third approach, explicitly espoused by Profs. Areeda and Turner, achieves the distinction with respect to the monopoly that results from market structure and economic performance, without any restrictive practices. Anxious to preserve § 2 coverage of that monopoly, they would permit the use of prospective equitable remedies to restore competition, at least at the instance of the government, while denying the availability of damage remedies as unfairly punitive in

the absence of wrongdoing. II *Antitrust Law, supra,* § 311c.

This Court agrees with their observation that "the fact that a situation is appropriate for equitable relief under the antitrust laws is not automatically or necessarily a warrant either for criminal punishment or for treble damages." II *Antitrust Law, supra,* § 311b. But see *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 457 F.Supp. at 438, referring to "an inaccurate supposition that there is a sharp dichotomy between suits in equity and damage claims." Whatever the appropriateness of the distinction between damages and equitable relief in other contexts, it is viewed in the context of this case as a matter of statutory construction, harmonizing the protective purposes of the patent laws with the competitive purposes of the antitrust laws.[26] The usefulness of the private treble damage action for effective enforcement of the antitrust laws, see *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965), will not be impaired by recognizing that in some circumstances the patent laws can best be accommodated to the antitrust laws by permitting only prospective equitable remedies.

While it may be that Xerox's failure to license patents, on which so much of SCM's claim in this case depends, is not a violation justifying any relief, a holding of that breadth might preclude prospective equitable relief in those cases where the purposes

---

**25.** *See also* Adelman, "Property Rights Theory and Patent-Antitrust: The Role of Compulsory Licensing," 52 N.Y.U.L.Rev. 977, 1005 (1977), considering only equitable relief to remedy patent-related anti-competitive conduct.

**26.** This would not be the first time a purpose of the patent laws has been vindicated by imposing upon another body of law a limitation deemed to be necessary by the general body of patent law, rather than a specific patent law provision. *In Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court imposed upon state contract law a prohibition against estoppel of a licensee to contest the validity of the licensed patent. Though operating to limit the contracting freedom of the patentee, *Lear* promotes a purpose

of the patent laws by eliminating an impediment to an attack on an invalid patent.

Nor would it be the first time the antitrust laws have been limited in order to achieve objectives safeguarded by another body of law. When the competitive purposes of the antitrust laws have collided with the protective purposes of the labor laws, the Supreme Court has relied not only on the specific exemption of § 6 of the Clayton Act, 15 U.S.C. § 17, but also on the "nonstatutory exemption [that] has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." *Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975).

of the antitrust laws warrant such relief, and where the granting of such relief would not have the same adverse effects upon the purposes of the patent laws as would the imposition of damage liability. In short, the distinction is advanced in this case, as a matter of statutory accommodation, not to disallow damages otherwise recoverable, but to leave open the prospect of equitable relief otherwise foreclosed.[27]

These considerations provide a background against which to assess the legal sufficiency of SCM's several theories in support of its 1969 exclusion claim. It may be helpful to consider separately each of SCM's contentions under § 7 of the Clayton Act and §§ 1 and 2 of the Sherman Act.

*Section 7.*

There are two aspects of SCM's § 7 claim. The first and basic contention is that the 1956 and 1959 acquisitions of Carlson and Battelle patents pursuant to the 1956 agreement were unlawful when made and were a proximate cause of SCM's injury. The second claim is that the continued holding of these patents by Xerox in 1969 was unlawful and was a proximate cause of SCM's injury.

An acquisition condemned under § 7 is one whose probable effect is to lessen competition or tend to create a monopoly in a relevant market. SCM made no claim in this case that the convenience office copier market or the plain paper copier sub-market existed in 1956 or 1959 when the challenged acquisitions were made. The SCM evidence sought to prove that the markets existed by 1964, when SCM first claimed entitlement to licenses. In view of the fact that the markets were alleged to come into

existence after the challenged acquisitions, the jury was instructed that in determining whether the acquisitions had the probable proscribed effect (Question 20), they should consider whether it was reasonably foreseeable at the time of the acquisitions that the markets would exist and that the proscribed effects would occur in such future markets. (Tr. 43,942–45). These instructions were amplified at the parties' request (Tr. 44,-248–60) and further amplified after specific inquiry from the jury (Court Ex. 88, Tr. 44,332–35).

■ Liability for retrospective money damages cannot be predicated under § 7 upon a patent acquisition made prior to the existence of a relevant product market. No case has ever upheld such liability, and its allowance in this case would be beyond any reasonable accommodation of the patent and anti-trust laws. Indeed, there is considerable doubt whether liability can be grounded under § 7 for the mere acquisition of any asset prior to the existence of a relevant product market. Section 7 contains its own prospective element concerning the probable future anti-competitive effects of an acquisition in a relevant product market. It is one thing to subject the acquirer of an asset to the risk that he may be liable in damages if he incorrectly assesses the likelihood that his acquisition may in the future substantially lessen competition or tend to create a monopoly in an existing market. But it would be an extreme extension of § 7 to impose upon the acquirer the additional risk of assessing the likelihood that a relevant product market would come into existence at some time in the future.

If § 7 could ever be interpreted to impose liability for money damages for acquisition

---

**27.** The distinction need not necessarily be applied to all damage liability. What is at issue in SCM's 1969 exclusion claim is damage liability for the profits a potential competitor would have made had it been granted the right to use a monopolist's patents. That is a very different claim, for example, from a claim by a monopolist's customer that it has been forced by a restrictive marketing practice (availability only on long-term leasing) to pay excessive prices for the use of a monopolist's patented products. *See Hanover Shoe, Inc. v. United Shoe Machin-*

*ery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). And it differs from the claim of a monopolist's competitor who has suffered loss of sales and lawsuit expenses because of an infringement action brought by the monopolist, without knowledge of the details of the competitor's product, to drive the competitor out of business. *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir. 1952). Damage claims of this sort do not suggest damage liability for a unilateral refusal to license patents.

of property prior to the existence of a relevant market, the policies of the patent laws prohibit such an interpretation as to an acquisition of patents. The purpose of the patent laws is to "promote the Progress of Science and useful Arts." U.S.Const., Art. 1, § 8, Cl. 8. Achievement of that objective is not limited to internally developed inventions. A traditional approach to development of significant products is assignment by the inventor of an exclusive license or the patent itself to a company willing to risk the investment needed for commercial success.

■ Of course acquisitions of patents are not exempted from § 7. *United States v. Lever Brothers Co.*, 216 F.Supp. 887, 889 (S.D.N.Y.1963); *United States v. Columbia Pictures Corp.*, 189 F.Supp. 153, 181–82 (S.D.N.Y.1960). In some circumstances a patent acquisition may so strengthen a company's power within an existing relevant market and pose such a likely threat of the anti-competitive effects condemned by § 7 that equitable relief may be warranted to prohibit the acquisition or to require prospective licensing, or that a court of equity should withhold injunctive relief when the acquirer seeks to enjoin infringement of the acquired patents. Perhaps damages are available in such circumstances. But to impose damage liability for an acquisition made prior to the existence of a relevant product market would risk inhibiting the commercialization of patented inventions to an extent inconsistent with the purposes of the patent laws. Inventors and companies that wish to acquire patented inventions in the hope of achieving commercial success may share the dream of developing products that will one day find such public acceptance as to constitute their own relevant product market, and if that prediction is made and actually achieved, its financial rewards are protected by the patent laws and not required by the antitrust laws to be shared with competitors.[28] The rewards are protected, not for "the creation of private fortunes," *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 511, 37 S.Ct. 416, 61 L.Ed. 871 (1917), but to provide the incentive for the necessary investment.

It is therefore unnecessary to consider Xerox's contentions that the evidence was insufficient to support the implicit jury determination that the relevant product market and sub-market was reasonably foreseeable at the time of the acquisitions or that such a determination was so contrary to the weight of the evidence as to warrant a new trial.[29]

■ Even if a relevant product market had existed at the time of the patent acquisitions, there is no basis for permitting a damage award for a § 7 violation by an acquirer of patents with no market power prior to the acquisition. Section 7 is concerned with undue concentrations of power and the anti-competitive effects of permitting one entity with market power to

28. It must be acknowledged that if equitable relief is warranted to require prospective licensing of a patent acquired in violation of § 7, or if an injunction against an infringer is withheld, the acquirer may well suffer monetary injury to the extent that he loses the exclusive right to profits he would otherwise enjoy for the life of the acquired patent. But as a matter of business reality, there is a world of difference between foregoing future profits and being obliged to pay damages retrospectively for the profits a competitor claims he would have made. Moreover, it is inconceivable that an equitable remedy of royalty-free compulsory licensing would be entered for a § 7 violation until long after the investment in developing the patented invention had been recouped.

29. Since the jury found that the relevant market and sub-market did not exist as of January, 1964, but did exist as of January, 1969, the foreseeability issue was put to the jury with two elements. The jury was told to consider the earliest time after January, 1964, that the market or sub-market came into existence and then consider whether a market or sub-market as of such earliest time was reasonable foreseeable at the time of the acquisitions. SCM has contended that the evidence warranted the entry of summary judgment in its favor on the contention that a relevant market and sub-market existed as of January, 1964. Even if that contention were sound, the foreseeability issue as to a future market would remain in the case, since SCM did not claim that a relevant market or sub-market existed at the time of the acquisitions.

strengthen its position by acquisition. See *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Even if SCM had claimed and the evidence had shown the existence of a convenience office copier market in 1956 or 1959, a § 7 violation justifying an award of damages cannot occur when patents are acquired by a company that has no share at all of such a market. In 1956 and 1959 Xerox did not produce a convenience office copier.[30] Whether such a violation could occur by acquisition of assets other than patents need not be considered. But simply transferring the exclusionary power of valid patents from an inventor or a research institute to a company with manufacturing and marketing potential does not create damage liability under § 7 when the acquiring company has no market power in the relevant product market. For the patent laws to achieve their purpose, a company without any present market power, because it has yet to develop a product, must remain free, at least of the threat of a damage remedy, to acquire patented inventions and to risk its time and money toward their commercial application.

It is highly questionable whether a § 7 violation occurs at all when a company acquires patents prior to the existence of a relevant product market or acquires patents at a time when it has no market power in a relevant product market. However, it is sufficient for assessment of the acquisition aspect of SCM's § 7 claim to conclude that even if there was a violation warranting prospective equitable remedies, the proper way to harmonize the patent and antitrust laws is at least to preclude a damage remedy for the profits a competitor maintains it would have made had the acquisition not occurred.

Therefore, there is no need to consider Xerox's challenge to the jury's finding that the acquisition of patents pursuant to the 1956 agreement was a proximate cause of SCM's not entering into plain paper copying

in 1969. (Question 27a). Implicit in this verdict, in view of SCM's contentions, is a finding that if Xerox had not acquired the Carlson and Battelle patents, Battelle would have insisted upon the sub-licensing of these patents to other companies including SCM. That finding, Xerox contends, is unsupported by the evidence or at least contrary to the weight of the evidence. Though Xerox's contentions on this point need not be decided, significant issues would arise concerning the statute of limitations and the proper construction of § 7, as well as the issues of evidential sufficiency, if a damage award for profits not earned because of a license refusal could be based on the prediction that had Battelle not sold the patents in 1956, it would have required their sub-licensing to SCM in 1969.

Wholly apart from its claim concerning unlawfulness of the patent acquisitions in 1956 and 1959, SCM contends that a § 7 violation warranting a damage award occurred in 1969 by reason of Xerox's continued holding of the patents previously acquired. This contention is based on SCM's attempt to apply the doctrine of *United States v. du Pont & Co. (General Motors),* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), and *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), to the continued holding of patents. The jury found that by 1969 the convenience office copier market and plain paper copier sub-market existed and that Xerox possessed monopoly power in these markets. (Question 1a, 2a, 3a). Thus the barriers to a damage recovery based on the alleged unlawfulness of the initial acquisitions in 1956 do not defeat recovery on a claim of violation as of 1969, and it is therefore necessary to consider the validity of the jury's verdict sustaining SCM's claim that as of January, 1969, the probable effect of Xerox's continued holding of patents acquired pursuant to the 1956 agreement was substantially to lessen competition or to tend to create a monopoly in the relevant

**30.** SCM makes no claim that the flat plate equipment or the copy-flo equipment could be considered a convenience office copier.

product market and sub-market. (Question 21a).[31]

In *du Pont (General Motors)* the Supreme Court held that the lawfulness of an acquisition under § 7 is to be tested not only at the time of the acquisition but "any time when the acquisition threatens to ripen into a prohibited effect." 353 U.S. at 597, 77 S.Ct. at 879. As expressed in *ITT Continental Baking*, "[T]here can be a violation at some time later even if there was clearly no violation . . . at the time of the initial acts of acquisition." 420 U.S. at 242, 95 S.Ct. at 937. However, no case has ever applied the "holding" theory of § 7 to award compensatory damages simply for holding shares or assets, and SCM's effort to do so here fails for three reasons.

First, even as to a holding of shares, the liability for equitable relief upheld in *du Pont (General Motors)* and for damages in the subsequent derivative action, *Gottesman v. General Motors Corp.*, 414 F.2d 956 (2d Cir. 1969), was based on an impermissible *use* of the shares. "Sec. 7 contemplates an action at any time the stock is used to bring about, or in attempting to bring about, the substantial lessening of competition." 353 U.S. at 597–98, 77 S.Ct. at 879–80. The shares of General Motors were not merely held by du Pont. As viewed by the Supreme Court, the record was clear "that du Pont purposely employed its stock to pry open the General Motors market to entrench itself as the primary supplier of General Motors' requirements for automotive finishes and fabrics." 353 U.S. at 606, 77 S.Ct. at 884. It is true that the Second Circuit in *Gottesman* subsequently observed that "what was unlawful was du Pont's status as stockholder in General Motors . . . ." 414 F.2d at 965. However, the

Court of Appeals later made clear that a holding of stock is not enough; the plaintiff must show that the defendant "did in fact so use its stock ownership as to cause injury to the plaintiff . . . ." *International Railways of Central America v. United Brands*, 532 F.2d 231, 247 (2d Cir. 1976).

SCM cannot base a damage claim under the "holding" theory of § 7 simply because in 1969 Xerox held patents that it had previously acquired. There is no claim that the patents were used to inflict damages. The only thing Xerox is alleged to have done with its acquired patents that caused SCM damage is to decline to license them. That is not a sufficient use of a held asset to create liability for compensatory damages.[32]

Second, even if the holding of an asset unaccompanied by anti-competitive use could create § 7 liability, such a theory cannot support a compensatory damage award to SCM because there is no obligation under § 7 to share even a wrongfully held asset with competitors. What du Pont was ultimately obliged to do with its General Motors shares was to sell them for value on the open market. *United States v. du Pont & Co.*, 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961). It was not obliged to share the attributes of ownership with anyone.

Third, even if the "holding" theory of § 7 could create damage liability for the holding of some assets, a proper reconciliation of the patent and antitrust laws precludes the application of such a doctrine to patents. The purposes of the patent laws would be substantially impaired if a company that acquired patents lawfully and later found that the success of products embodying the patented inventions gave the com-

---

**31.** No issue was submitted to the jury as to whether the holding of the acquired patents was a proximate cause of SCM's not entering into plain paper copying in 1969. As SCM contends, there was no fact-finding to be done concerning this issue. If the holding of the patents created a duty under § 7 to license them, then the failure to license was a proximate cause of the damages due to the loss of profits the jury found SCM would have earned had it been granted licenses. (Questions 50

and 51). That conclusion follows once the jury determined that as of January, 1969, SCM had the intention, preparedness, and capability to enter plain paper copying. (Question 22a).

**32.** This situation is to be contrasted with *ITT Continental Baking*, where after entry of a consent decree prohibiting acquisitions in specific product lines, defendant was held liable for daily fines for subsequent acquisitions in violation of the decree.

pany substantial power in a relevant market had to weigh the risk of a trebled damage award whenever it declined to license the patents and thereby exercised what it understood were its rights, under the patent laws, to the exclusive use of the patented inventions. If the "holding" theory of § 7 applies at all to patents, the remedies for a violation based on this theory are limited to prospective licensing or withholding of equitable relief to enjoin infringement.

Section 7 does not provide the basis for an award of compensatory damages on the 1969 exclusion claim.

*Section 1.*

The jury concluded that as of January, 1969, the 1956 Xerox-Battelle agreement was an unreasonable restraint of trade (Question 15a) and that the agreement or the acquisition by Xerox of patents pursuant to that agreement was a proximate cause of SCM's not entering into plain paper copying in 1969 (Question 27a). There are five aspects of the agreement, and none of them, singly or in combination, provides a valid basis for entering a money judgment based on these verdicts of the jury.

■ A salient feature of the 1956 agreement was, of course, the transfer of title to the Carlson patents and the Battelle improvement patents to Xerox in 1956 and 1959. As previously discussed, that transfer did not create liability for money damages under § 7 of the Clayton Act. If the transfer of title is not a basis for money damages under § 7, it cannot be a basis for money damages under the more rigorous standards of § 1. The restraint condemned by § 1 is an unreasonable restraint upon competition, *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The transfer of title to the Carlson and Battelle patents had no adverse impact upon competition in 1956 or 1959 because there was no competition in any convenience office copier or plain paper copier

embodying the patented inventions. It must be recalled that the first Xerox plain paper convenience office copier, the 914, was not marketed until 1960.

Nor can the fact of the patent acquisitions in 1956 and 1959 give rise to damage liability under § 1 in 1969. Whatever the conceivable application of the "holding" theory of § 7 to patents, there is no authority for upholding damage liability under § 1 because of the subsequent holding of a patent previously acquired. The infirmities of applying such a theory to damage liability for the holding of patents under § 7 are fully applicable to § 1.

■ Arguably more pertinent is the aspect of the 1956 agreement obligating Battelle to assign to Xerox all subsequently discovered patented inventions relating to xerography as long as Xerox maintains a level of research expenditures at Battelle in excess of $25,000 per year. On its face, an agreement enabling a company with monopoly power to require assignment to it of all future patents in the pertinent field that the contracting party may develop or acquire raises substantial issues under § 1.

This aspect of the 1956 agreement cannot support the entry of any judgment for exclusion damages in favor of SCM, however, because SCM neither claimed nor presented evidence from which the jury could reasonably conclude that SCM suffered damages for lack of licenses under any patents Battelle obtained after 1959 and assigned to Xerox. The SCM damage evidence was premised on the assumption that in 1969 SCM would have received licenses to use all of Xerox's plain paper copier patents. A few of the patents Battelle obtained after 1959 and assigned to Xerox may well have been useful in improving plain paper copiers. But SCM offered no evidence to show that it could have made profits with licenses to use only Battelle's post-1959 patents. Since SCM is not entitled to damages for lack of licenses to use the Carlson and Battelle improvement patents acquired by Xerox in 1956 and 1959, SCM has proved no damages because it was denied licenses on

the few patents acquired from Battelle after 1959, only four of which were used in plain paper copiers.[33]

The third aspect of the 1956 agreement, and the one now most relied upon by SCM, is the termination of Xerox's contractual obligation to Battelle, pursuant to the 1948 and 1951 agreements, to use diligent efforts to secure sub-licensees for the commercialization of the patents for which Xerox had obtained exclusive licenses from Battelle. Preliminarily, Xerox contends that the termination of the sub-licensing obligation was of no significance because of the evidence that Battelle expected Xerox to seek sub-licensees only for applications of xerography to fields other than plain paper copying. It is not necessary to assess the sufficiency of the evidence to support the implicit jury finding that the 1956 agreement did terminate a sub-licensing obligation under which sub-licensing of xerographic patents for plain paper copying would have occurred. Even if the termination had that effect, it cannot validly be found to be an unreasonable restraint of trade, and in no event can support a damage award for the profits that would have been made if sub-licensing had occurred.

The grant of an exclusive license from Battelle to Xerox pursuant to the 1948 agreement, as reconfirmed in the 1951 agreement and extended to worldwide rights, was entirely lawful when made. Whatever contractual obligation Xerox owed Battelle to seek sub-licensees was not needed to assure the lawfulness of the 1948

and 1951 license agreements. This case differs from *Western Geophysical Co. of America v. Bolt Associates, Inc.,* 305 F.Supp. 1251, 1254–55 (D.Conn.1969), aff'd, 584 F.2d 1164 (2d Cir. 1978), where an obligation to seek sub-licensees for a perfected device eliminated any question as to whether an exclusive licensing agreement might have unlawful anti-competitive effects. As to embryonic technology, a decade prior to successful commercial application, exclusive patent licenses from a research institute to a commercial developer with no market power in the pertinent field cannot possibly be an unreasonable restraint of trade, even if the developer assumes no obligation to seek sub-licensees.

As the holder of lawfully granted exclusive licenses to use the Battelle patents, Xerox had a lawful monopoly with respect to the inventions covered by those patents. Xerox had the lawful right to exclude anyone else from using those patents for their unexpired terms. That lawful monopoly is the essence of the patent, and its exercise, valid under the patent laws, cannot be a violation of the antitrust laws. If the 1956 agreement had not been made, Xerox would have incurred no liability under the antitrust laws by refusing to sub-license SCM or anyone else under the Battelle patents. It may be that a refusal to sub-license would have given Battelle a claim for breach of contract. But SCM was not a third-party beneficiary of the 1948 and 1951 agreements by which Xerox acquired its exclusive licenses. Since Xerox would have

33. This gap in SCM's proof makes it unnecessary to consider several Xerox contentions concerning the claim based on patents acquired from Battelle after 1959. First, Xerox relies on the jury's answer to Question 35, finding, as Xerox contended, that it was not possible to make a commercially reliable xerographic plain paper copier prior to March 11, 1969, without infringing the Carlson '699 patent. Xerox contends that since the lack of this single patent, acquired by Xerox in 1956, prevented SCM from manufacturing a non-infringing product until a date after January, 1969, SCM cannot complain of lack of post-1959 patents and receive damages for the profits it claims it would have made starting with use of the Xerox patents in January, 1969.

Second, Xerox contends that the acquisition of the post-1959 patents from Battelle could not be a violation of § 1 (or § 7) because all xerographic research at Battelle after 1955 was sponsored by Xerox, and the sponsor, having taken the risk of investing in the research, was entitled to the results.

Third, Xerox contends, as it has with respect to all the patents acquired pursuant to the 1956 agreement, that the evidence is insufficient to support a verdict that, without the agreement, Battelle would have caused the patents to be sub-licensed for plain paper copying to others including SCM, or at least that such a conclusion is against the weight of the evidence.

incurred no antitrust liability by refusing to sub-license the Battelle patents before 1956, it cannot incur antitrust liability thereafter by entering into a contractual arrangement that confirms its right to refuse to grant licenses.

The situation would of course be different if the holder of patent rights, whether patentee or exclusive licensee, contracted with another *not* to license or sub-license others. That type of agreement is a restraint of trade, and it may properly be found to be unreasonable. The restraint arises from the fact that someone other than the holder of the lawful right to exclude has by agreement been given the power to prevent licensing. The 1956 agreement, even in SCM's view, gave to Xerox, which already held the power to exclude, freedom from Battelle's right to insist on licensing. The acquisition of that freedom put Xerox in the same position as any patentee or exclusive licensee. It may be that the likelihood of sub-licensing by Xerox was less under the 1956 agreement than before it. But that would be true of an agreement between a patentee and several holders of non-exclusive licenses to cancel the licenses. Indeed, an agreement to terminate non-exclusive licenses would *assure* less licensing immediately after the agreement than before it. But neither the certainty of less licensing nor the increased likelihood of less licensing is an unlawful restraint of trade unless the agreement imposes some unlawful restraint on the holder of the patent rights. The 1956 agreement imposed no restraint whatever on Xerox's power to decide whether or not to license the exclusive rights it lawfully held to the Battelle patents.

Two other aspects of the 1956 agreement require little comment. Battelle agreed to transfer to Xerox all data and know-how concerning xerography that Battelle might acquire in the future, the obligation to continue as long as Xerox funded at least $25,000 of research at Battelle per year. SCM made no claim and offered no proof that it suffered any damage for lack of any data and know-how that Battelle transferred to Xerox pursuant to this obligation.

The 1956 agreement also terminated Xerox's obligation under the 1951 agreement to assign to Battelle title to any new xerographic patents that Xerox might obtain, with Xerox taking back an exclusive license. The termination of this provision of the 1951 contract is not a restraint of trade in violation of § 1. Trade is not restrained within the meaning of § 1 when a company secures freedom to keep title to its own internally developed patents.

Section 1 does not provide the basis for an award of compensatory damages on the 1969 exclusion claim.

*Section 2.*

The jury concluded that in January, 1969, Xerox had monopoly power in both the convenience office copier market and the plain paper copier sub-market (Question 3a). That finding requires consideration of the appropriate standard for determining whether that monopoly power was willfully acquired or maintained so as to constitute a violation of § 2, *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), and whether a § 2 violation by Xerox, if it occurred, created a duty to license patents for breach of which damages may be awarded.

As previously indicated, some accommodation had to be made between the patent and the antitrust laws in focusing the jury's attention on the issue of willful acquisition or maintenance of monopoly power in a case dealing primarily with patents. Otherwise every effort to obtain a patent, whether by internal development or purchase, could be considered an attempt to acquire monopoly power, since the power to exclude, which is the essence of every patent, is monopoly power. With considerable uncertainty, in the absence of authoritative guidance in this area, the Court endeavored to give the jury a standard for distinguishing between what was termed "lawful patent power" and "unlawful patent power," with the exclusionary power of only unlawful patent power permitted to be considered on the issue of whether monopoly power had been willfully acquired or maintained.

The distinction between lawful and unlawful patent power was applied to both internally ·developed and externally obtained patents. As to the former, the jury was told that while normally a company was entitled to obtain patents from the U.S. Patent Office on its own inventions without any limitation, see *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), an exception existed in the case of a company that had acquired monopoly power in a relevant market. The jury was told that once a company had acquired monopoly power, it could not thereafter acquire lawful patent power if it obtained new patents on its own inventions primarily for the purpose of blocking the development and marketing of competitive products rather than primarily to protect its own products from being imitated or blocked by others. (Tr. 43,846–51). While there is no case law authority for this standard,[34] it appears to make a reasonable accommodation between the policies of the patent and antitrust laws, unless there is to be no limitation whatsoever on the purposes for which a monopolist can add to its exclusionary power through generation of new patents. The only threat to the policies of the patent laws would seem to be the possible inhibition on research investment because of the risk that bona fide research directed at new product development might one day be found to have been motivated primarily by a desire to block others from bringing competitive products to market. It would seem to be a fair question whether assigning that risk to a company with monopoly power is a reasonable cost to avoid the substantial market control that would ensue if a company with monopoly power were free to continue its dominant position by patenting, for blocking purposes, alternative methods of competition.

The jury eliminated this issue from the case by finding that SCM had not proved that Xerox, after it had monopoly power, obtained any patents from the Patent Office primarily for the purpose of blocking the development and marketing of competitive products. (Question 5a).

As to externally obtained patents, the jury was told that the exclusionary power of patents was unlawful patent power if the patents were acquired in violation of either § 7 of the Clayton Act or § 1 of the Sherman Act. (Tr. 43,853–55). The jury found that the acquisition of patents pursuant to the 1956 Xerox-Battelle agreement violated the standards of § 7 (Question 20) and § 1 (Question 15), but was not asked for specific findings with respect to any other acquisitions of patents or patent rights.

As to both internally developed and externally obtained patents, the jury was told that unlawful patent power results if the holder of lawful patent power makes an agreement in violation of § 1 not to license the patent. (Tr. 43,807, 43,858). The jury eliminated this issue from the case by finding that SCM had not proved the alleged agreement between Xerox and others to deny plain paper copier patent licenses. (Question 16).

Wholly apart from patents, the jury was told that any anti-competitive or exclusionary conduct could be found to be indicative of willful acquisition or maintenance of monopoly power if such conduct added some significant market power. (Tr. 43,860). No questions were submitted concerning any specific conduct.

Having been instructed as to these standards for determining whether patent-related conduct and any other conduct could be found to be the willful acquisition or maintenance of monopoly power, the jury was then asked to determine whether as of January, 1969, Xerox willfully acquired or

---

**34.** The suggested standard is considered and apparently disapproved by Areeda and Turner, III *Antitrust Law, supra*, § 706b, either because a case meeting the standard would be "hard to find" or because the various motivations of an inventor are so inextricably intertwined that the search for an improper motivation is not worth making. *But see* Turner, "The Patent System and Competitive Policy," 44 N.Y.U.L. Rev. 450, 455 (1969): "[T]he patent system has at times induced the use of research resources solely for the purpose of providing blocking patents."

maintained monopoly power in a relevant market or sub-market "by conduct *other than* obtaining and exercising lawful patent power." (Question 4a). While that is an awkward way for a jury to be asked to make a factual determination, it at least afforded some assurance that the jury would not be permitted to find a § 2 violation solely on the basis of legitimate ownership and enforcement of lawfully developed and acquired patents. The jury found, under this "other than" formulation, that Xerox had willfully acquired or maintained monopoly power. (Question 4a). Since the jury found that the acquisition of patents pursuant to the 1956 Xerox-Battelle agreement violated the standards of § 7 (Question 20) and § 1 (Question 15), it may be presumed that, under the instructions, these findings were a principal basis for the finding of the second element of a § 2 violation.[35]

It should be noted, however, that SCM urged additional conduct by Xerox as evidence of willful acquisition or maintenance of monopoly power. With respect to patents, SCM contended that Xerox had sought to strengthen its monopoly position by acquisition of patents from another company, Horizons Corp., and by grant-backs of patent rights from companies licensed to use xerographic patents for non-copier purposes. In at least one instance, the grant-back licenses were exclusive, a circumstance the jury was told could be found to be indicative of willful maintenance of monopoly power. (Tr. 43,855–56, 43,914–17). Apart from patent-related conduct, the principal if not the only exclusionary conduct complained of was the use of two-year post-employment covenants not to compete, required by Xerox for a time from all of its employees. See *Xerox Corp. v. Neises*, 31 App.Div.2d 195, 295 N.Y.S.2d 717 (1st Dept. 1968). See also *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057 (2d Cir. 1977). In addition to exclusionary conduct, SCM alleged anti-competitive marketing practices, which may have been evidence of willful maintenance of monopoly power.[36]

Since the jury found the elements of a § 2 violation (Questions 3a and 4a), consideration must be given to whether, in the circumstances of this case, Xerox's refusal to license constitutes a basis for imposing liability for damages. A threshold inquiry is to determine when, if ever, a unilateral refusal to license is a violation of § 2 warranting any relief. Several standards are available. A duty to license could be claimed to arise whenever a company has monopoly power, analogous to a monopolist's duty to deal in non-patented products when a refusal to deal would maintain monopoly power. See *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). Or a duty to license patents might arise whenever a company not only has monopoly power but also abuses its market position by engaging in some injuri-

---

**35.** Since this Court has concluded that the 1956 Battelle agreement cannot create damage liability under §§ 1 or 7, that conclusion may preclude damage liability under § 2 based on that agreement alone. However, the claim for damages under § 2 needs to be explored because a reviewing court may conclude that the 1956 agreement supports liability for damages, or violates §§ 1 or 7 but supports liability only for prospective equitable relief. Even if the 1956 agreement is not itself a violation of any antitrust provision, it might be some evidence of willful acquisition of monopoly power. If damage liability under § 2 for a refusal to license is not warranted under any view of the facts of this case, that conclusion would eliminate the need for a retrial to determine whether any conduct other than the 1956 agreement creates damage liability under § 2 for the 1969 license refusal.

**36.** SCM also alleged that willful acquisition and maintenance of monopoly power could be inferred from the arrangements between Xerox and its family of companies. Even though the jury rejected SCM's contention that these companies made an agreement to exclude all others from plain paper copying (Question 18), the jury may have accepted SCM's contention that these companies divided the world into exclusive territories for marketing purposes. That conduct, if found to have occurred, *see* note 19, *supra*, would primarily injure consumers denied the availability of more competing suppliers, rather than a potential market entrant, like SCM, who might be better off if insulated in the United States from the competition of Rank-Xerox and Fuji-Xerox.

ous conduct, other than the license refusal itself. Most pertinent would be patent-related exclusionary conduct, such as patent misuse or a bad faith infringement suit. Less pertinent would be any exclusionary conduct, whether or not patent-related. Still less pertinent would be any anti-competitive conduct, whether or not it had any tendency to exclude.[37]

Instead of instructing the jury with respect to any one of these standards, the Court endeavored to submit jury interrogatories that framed a progression of alternative theories to provide a basis for subsequent court adjudication. The bare existence of monopoly power was determined by the answer to Question 3a. Additional questions were asked to determine the existence of conduct that abused monopoly power. The answer to Question 4a determined that Xerox engaged in some anti-competitive conduct, other than obtaining or exercising lawful patent power, that showed willful acquisition or maintenance of monopoly power. The answer to Question 23a determined that Xerox engaged in some exclusionary conduct, other than obtaining or exercising lawful patent power. The answer to Question 24a determined that Xerox engaged in some patent-related exclusionary conduct, other than obtaining or exercising lawful patent power.

The answer to Question 24a also determined that Xerox's patent-related exclusionary conduct was a proximate cause of SCM's not entering into plain paper copying in 1969. Since SCM had alleged antitrust violations based solely on the 1956 Battelle agreement, the jury was specifically asked whether the 1956 Xerox-Battelle agreement or the acquisition by Xerox of patents pursuant to that agreement was a proximate cause of SCM's not entering into plain paper copying. (Question 27a). The jury answered "yes."

Fortuitously, as it turned out, the return of these verdicts prompted additional interrogatories, which established that the 1956 Battelle agreement was the only patent-related exclusionary conduct of Xerox that was a proximate cause of SCM's not entering into plain paper copying in 1969. In its initial proximate cause verdicts the jury answered "yes" to Question 27a, concerning the 1956 Battelle agreement, and at the same time answered "no" to Question 23a, concerning exclusionary conduct, and "no" to Question 24a, concerning patent-related exclusionary conduct. These answers appeared to create an inconsistency, although, as SCM contended after the verdicts were returned, a likely explanation was that the Court's charge with respect to Questions 23a and 24a had diverted the jury's attention away from the Battelle agreement and possibly caused them to believe the questions concerned conduct other than the Battelle agreement.

The possible inconsistency was called to the jury's attention,[38] and after further deliberation, the jury changed their answers to Questions 23a and 24a from "no" to "yes." That revision appeared to make it clear that the 1956 Battelle agreement was the sole basis for the "yes" answer to Questions 23a and 24a. To be sure, the jury was given a further interrogatory, Question 27a-1, which asked whether the "yes" answer to Question 27a was the sole basis for the "yes" answers to Questions 23a and 24a. The jury answered "no" to Question 27a-1 and submitted a note, Court Exhibit 117,

---

37. This appears to be the standard urged by SCM. Its Request to Charge No. § 2–64 read: "If you find that Xerox engaged in any restrictive, exclusionary or anti-competitive conduct which contributed to its achievement or maintenance of monopoly power, then on that basis you must also find that Xerox's refusals to grant a license were themselves each in violation of Section 2 of the Sherman Act."

38. The submission of additional interrogatories to resolve a possible inconsistency in special verdicts raised an issue under Fed.R.Civ.P. 49,

which specifically authorizes further jury deliberation when an inconsistency arises in the use of special verdicts accompanied by a general verdict, Rule 49(b), but omits such authority when only special verdicts are used, Rule 49(a). *See Griffin v. Matherne*, 471 F.2d 911, 917 n. 6 (5th Cir. 1973). Whatever the practice may be under Rule 49(a) in a trial of normal duration, further jury deliberation rather than retrial seemed warranted to reach the objectives of Rule 1. (Tr. 44,644–45).

which stated that the "yes" answers to Questions 23a and 24a had not been given just to correspond to the "yes" answer to Question 27a, but had been given in light of the Court's instructions. That created a further ambiguity: the jury could have meant that it thought there were additional patent-related exclusionary acts besides the Battelle agreement that were a proximate cause of SCM's exclusion, or the jury could simply have meant that it was not answering "yes" to Questions 23a and 24a just to conform to the "yes" answer to Question 27a, but to conform to the substance of what the "yes" answer to Question 27a represented.

In a further attempt to have the jury's decision-making clear, the Court gave the jury an additional interrogatory, Question 24a-1, which directly asked them to list or describe whatever patent-related exclusionary conduct of Xerox was a proximate cause of SCM's not entering into plain paper copying in 1969. To this question, the jury answered only "1956 Battelle Agreement." Thus, despite SCM's objections to having the matter clarified, we now know without any doubt that the jury found the 1956 Battelle agreement to be the only patent-related exclusionary conduct that was a proximate cause of SCM's not entering into plain paper copying in 1969.

Therefore, SCM is limited to two claims in seeking to impose damage liability on Xerox under § 2. SCM can assert that the 1956 Battelle agreement, pinpointed by the jury as the only patent-related conduct causing exclusion, was conduct that violated § 2, or it can assert that Xerox's refusal to license its plain paper copier patents in 1969 was conduct that violated § 2.[39] SCM cannot predicate damage liability on any non-patent-related conduct because it neither claimed nor offered evidence that any such conduct, the post-employment covenants,

for example, caused it any damage. SCM's entire exclusion damage proof consisted of the losses suffered by lack of licenses. As to the 1956 Battelle agreement, wholly apart from the infirmities already discussed in predicating damage liability for this agreement under §§ 1 and 7, there could be no basis for imposing § 2 damage liability for making the agreement because in 1956 Xerox did not have monopoly power in a relevant market. To the extent SCM is claiming that the 1956 agreement made possible a wrongful denial of licenses in 1969, that is only another way of approaching the basic question of whether damage liability may be imposed under § 2 for the unilateral refusal to license patents.

A starting point for this inquiry is the case law concerning a prospective duty to license. It has long been held that compulsory licensing of patents is an appropriate remedy for an adjudicated antitrust violation involving a misuse of the patents. *Besser Manufacturing Co. v. United States,* 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952) (concerted refusal to license); *United States v. Gypsum Co.,* 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89 (1950) (concerted price-fixing in patent licenses); *United States v. National Lead Co.,* 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947) (concerted pooling of patents to restrict trade); *Hartford-Empire Co. v. United States,* 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945) (same).

The singular example of prospective licensing as a remedy for an adjudicated antitrust violation not involving patent misuse is *United Shoe Machinery Corp. v. United States, supra.* The violation was based primarily on monopoly power and marketing of products only pursuant to a 10-year lease. While the District Court opinion noted that United's acquisition of about 5% of its patents from others buttressed its mar-

---

**39.** No issue was submitted to the jury as to whether the refusal to license in 1969 was a proximate cause of SCM's not entering into plain paper copying. As was the case with SCM's "holding" theory under § 7, *see* note 31, *supra,* if § 2 required licensing, then the failure to license was a proximate cause of SCM's lost profits. The only factual issue concerning cau-

sation was raised by Xerox's defense that the license refusal did not "cause" losses because SCM could reasonably have avoided any losses by entering the market with its own infringing products and then asserting as a defense to the infringement suit the same § 2 claims it asserts now. The jury rejected this defense (Question 33).

ket power and in some instances made it less likely that United would have competition, 110 F.Supp. at 333, there is no indication that this observation was a basis for the finding of a § 2 violation, nor for the determination that compulsory licensing was an appropriate remedy. Indeed the District Court specifically noted that the compulsory licensing aspect of the decree was not adopted "for abusive practices respecting patents, for [United] engaged in none . . . ." 110 F.Supp. at 351.

These decisions do not intimate whether the conduct that warrants the equitable remedy of prospective licensing would justify the imposition of damage liability for the profits a potential competitor would have made if he had received patent licenses. In the *United Shoe* litigation, the subsequent adjudication of damage liability for United's § 2 violation concerned the higher prices that United's customer paid for the leased products over what would have been paid under outright sales. *Hanover Shoe v. United Shoe Machinery Corp., supra.* There is no suggestion in *United Shoe* or any subsequent litigation that damages might be awarded to a potential competitor of United's for the profits not earned for lack of patent licenses.

With respect to assets other than patents, there is authority that a monopolist's unilateral refusal to deal violates the antitrust laws where the refusal is part of an attempt to further monopoly power. *E. g., Lorain Journal Co. v. United States, supra; Otter Tail Power Co. v. United States, supra.* These cases have found a violation in the context of a government action seeking equitable relief, but other cases have sustained the sufficiency of complaints by private parties seeking damages for a monopolist's unilateral refusal to deal. *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir. 1966); *Banana Distributors, Inc. v. United Fruit Co.,* 162 F.Supp. 32 (S.D.N.Y.1958), *rev'd on*

other grounds, 269 F.2d 790 (2d Cir. 1958); *Greenleaf v. Brunswick-Balke Collender Co.,* 79 F.Supp. 362 (E.D.Pa.1947).

Even these cases, however, indicate no more than the legitimacy of damage liability for a monopolist's unilateral refusal to sell a product or service generally available to customers. They do not necessarily determine that even a monopolist is liable for damages when he refuses to share his assets with a potential competitor. The Lorain Journal Company, for example, violated § 2 by refusing to sell advertising space to anyone advertising on a competing radio station, not for refusing to permit a potential competitor to use its printing presses. Of course, a patent, unlike most assets, can be used simultaneously by its owner and by others, and such multiple use causes no reduction in use by the owner.

In any event, neither the authorities upholding prospective licensing of patents for adjudicated § 2 violations nor the authorities upholding damage liability for a monopolist's unilateral refusal to deal in assets other than patents determine whether damage liability may be imposed under § 2 for refusal to license patents. Determining the antitrust significance of a unilateral license refusal requires further exploration.

In a leading case finding a violation of § 2, it was observed, "Normally the patent owner is under no requirement to license the use of patents . . . ." *United States v. General Electric Co.* (lamps), 82 F.Supp. 753, 817 (D.N.J.1949). This same view has been expressed in numerous decisions of the Supreme Court,[40] although not in a context where the prospective competitor, denied a license, sought damages on the claim that the patent owner's willful acquisition or maintenance of monopoly power created a duty to license. *Cf. United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), qualifying the frequently expressed right of a trader uni-

---

**40.** *See Special Equipment Co. v. Coe,* 324 U.S. 370, 65 S.Ct. 741, 89 L.Ed. 1006 (1945); *Hartford-Empire Co. v. United States, supra,* 323 U.S. at 432, 65 S.Ct. at 395 ("A patent owner . . . has no obligation either to use [the

patented invention] or to grant its use to others."); *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); *Bement v. National Harrow Co., supra,* 186 U.S. at 90, 22 S.Ct. 747.

laterally to refuse to deal with a customer with the phrase, "In the absence of any purpose to create or maintain a monopoly."

*G.E.* (lamps) also contains the implication that a refusal to license may have significance when combined with other exclusionary conduct. "*Standing by itself* General Electric's right to limit or deny patent licenses to those whom it does not desire to license without assigning a reason is not to be questioned." *Id.* at 900 (emphasis added). However, the holding in *G.E.* (lamps) appears not to be based on a refusal to license: "The power to exclude does not flow from the fact that General Electric denied licenses . . . ." *Ibid.*

The Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) asserts that "a decision not to . . . license certain patented inventions may be evidence of monopolization or a specific intent to monopolize under Section 2 of the Sherman Act." *Id.* at 231. Cited in support of this proposition are *United States v. Aluminum Co. of America,* 91 F.Supp. 333, 386 (S.D.N.Y.1950), and *United States v. General Electric Co.* (Carboloy), 80 F.Supp. 989, 1015 (S.D.N.Y.1948). The District Court's opinion in *Alcoa* observed that "the matter of patents . . . comprehends not only the existence of patents as a potential corporate resource, but also the manner by which the inventions are supplied to, *or withheld from,* the rest of an industry with the purpose or design of exploiting the same in order to improve the market position of the patent owner." 91 F.Supp. at 386 (emphasis added). It is not clear from this passage whether antitrust significance might arise from a refusal to license or from an insistence on restrictive license terms as a condition of obtaining a license. The issue appears not to have affected the decision, since the Court observed, "On some patents, no licenses are granted, but these seem to relate exclusively to minor process improvements which Alcoa considers to be part of its operating knowledge." 91 F.Supp. at 387.

*G.E.* (Carboloy) sheds little, if any, light on the significance of a unilateral refusal to license patents. The core of the misconduct was price-fixing by potential competitors. A possible implication concerning refusal to license may exist in the Court's discussion of the distinction between § 2 cases involving patents and other property. "Although in a non-patent case exclusion, unlawful achievement, and abuse of monopoly power may not need to be proved, elements of such conduct are necessary in a patent case before Section 2 may be invoked." 80 F.Supp. at 1015. In referring to the "exclusion" to be proved in a § 2 patent case, the District Court may have contemplated a refusal to license, but it was more likely referring to the "illegal boycott to prevent competition in the sale of unpatented tools," *id.* at 1009, that occurred in that case.

These authorities provide little guidance on the basic issue of whether damage liability may be imposed under § 2 for a unilateral refusal to license patents. The instances of prospective licensing as a remedy for adjudicated violations are not support for such damage liability. It is not the usual rule of law that a person is liable in damages for having failed to follow a course of conduct that a court of equity subsequently determines is appropriate to lessen or eliminate the effects of some unlawful practice. The antitrust violator need not speculate about what remedies a court of equity may one day order, on pain of paying damages if he makes an inaccurate prediction. For damage liability to be upheld under § 2 in this case, the refusal to license must itself be an actionable wrong.

■ No case has been found where a potential competitor has received lost profits as damages because of a patent owner's unilateral refusal to license a valid patent. In some circumstances, the refusal to license may be considered a § 2 violation warranting equitable relief. And perhaps a refusal to license could be evidence of elements of a § 2 violation warranting equitable relief and damage liability for some other anti-competitive conduct. But the need to accommodate the patent laws with the antitrust laws precludes the imposition

of damage liability under § 2 for a unilateral refusal to license valid patents. Such damage liability may not be imposed upon a company simply for having monopoly power nor as a penalty for abusing monopoly power by any other exclusionary or anti-competitive conduct. Such conduct renders the monopolist liable for three times the damage inflicted by that conduct. To impose damage liability for the losses suffered because of the license refusal itself would pose a serious threat to achieving the purposes of the patent laws.

It is a premise of the patent laws that a company employing inventors must have substantial incentive to spend money for research that may lead to patentable inventions. The "Progress of Science and useful Arts" is also aided by enabling a company, prior to the time it has developed a marketable product and thereby acquired any market power, to acquire patents from others, especially from non-competitor research entities. Such internal and external accumulations of patents may well lead to the development of inventions and products using inventions. The history of plain paper copiers, as evidenced by the record in this case, is an extraordinary example of such a development.

Perhaps under the principles of *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), an accumulation of internally developed and externally acquired patents may indicate that a company has achieved monopoly power and willfully maintained it. Even if such findings would be impermissible during the 17-year terms of the basic patents, they would more likely be upheld in the period after expiration of basic patents when improvement patents continue to afford dominance over an industry. A § 2 violation might be found, notwithstanding the suggestion that once the basic patents have expired, the improvement patents afford the dominant company no greater opportunity for protection than that available to potential competitors. In a high technology field where research, engineering, and production require considerable capital investment, it is unrealistic to expect a potential competitor, denied the

opportunity to earn profits from products protected by the basic patents, to invest the sums needed to invent patentable improvements in the hope that its improvements will prove superior to those likely to be invented by the dominant company during the period of its basic patent protection. The monopoly provided by the basic patents can provide a period of competitive insulation in which the dominant company can continue to develop improvement patents to maintain an insurmountable lead over potential competitors. That is the prospect Justice Douglas warned against in *Transparent-Wrap Machine Corp. v. Stokes & Smith Co., supra*, 329 U.S. at 646–47, 67 S.Ct. at 616: "As patents are added to patents a whole industry may be regimented. The owner of a basic patent might thus perpetuate control over an industry long after the basic patent expired."

A § 2 violation based on the dominance of a patent owner after the expiration of basic patents may well warrant prospective equitable relief, even if the patent owner, once having acquired monopoly power, simply continues to invest in research, to patent resulting inventions, and to exercise the lawful power to exclude, provided by each new patent, by refusing to license the patent. Prospective equitable relief may be required to achieve the competitive purposes of the antitrust laws, and it can be fashioned without undue impairment of the objectives of the patent laws. There is no reason to believe that RCA, IBM, or Xerox were inhibited in their investment toward new inventions because of the prospect that one day they might be required to license prospectively or, as happened, might agree to license prospectively in the face of a government suit seeking equitable relief.

However, the prospect of paying potential competitors three times the profits they would have earned if they had been granted patent licenses would pose a grave threat to achieving the objectives of the patent laws. The company facing such a prospect might well decide either to forego basic research and invest in other profit opportunities, or pursue research and forego patent protec-

tion, relying instead, especially in a high technology field, on the lead-time it could achieve before reverse engineering enabled competitors to market competitive products. There would be either fewer inventions or, at least, less public disclosure of inventions, or both.

The threat of retrospective treble damage awards for refusing to license is even more serious than the concerns that have been expressed about the wisdom of legislation for compulsory licensing. At least compulsory licensing, if required by statute, puts companies on notice that if their investment produces patentable inventions, their investment return is limited to their license royalties plus their profits from marketing products in competition with licensees. That will normally reduce the profits available from exclusive marketing of products, but even if the reduction were substantial, its economic impact would be less inhibiting to research investment than multiple treble damage awards for the profits not earned by potential competitors.

Even if in some industries the aggregate size of damage awards for a refusal to license would not exceed the reduction in profits caused by compulsory licensing, a statutory requirement of licensing would be a known factor to be considered when companies decide the amount of investment appropriate for research. Perhaps the profit reduction would be difficult to estimate, but at least the certainty of the licensing requirement would assist planning not only as to the level of research investment, but also as to the subsequent determination of product prices and license royalty rates.

On the other hand, treble damage awards for a refusal to license would inject major uncertainty into research investment decisions. When those decisions are made, no one can be sure that any one research effort will yield success. See Turner, "The Patent System and Competitive Policy," 44 N.Y.U. L.Rev. 450, 459–60 (1969). But some estimates can be made as to the likely return on capital from a given level of research investment. Those estimates could not possibly take into account the likelihood of antitrust damage awards at some future time. If products are developed and achieve success in the market-place, a decision to grant or refuse licenses would still have to weigh, on pain of treble damage awards, the chances that a fact-finder may one day agree with a potential competitor's definition of the relevant market, claim of monopoly power, and allegation of willful acquisition or maintenance of monopoly power. The inhibiting effect of both the size of damages awards and the uncertainty of their imposition would seriously frustrate achieving the objectives of the patent laws.

Some may contend that these considerations prove too much, that they point toward the elimination of any treble damage awards for antitrust violations, or at least toward their elimination in any case not fully anticipated by a prior adjudication. Whatever one may think of the legitimacy of treble damage awards when a "modest extrapolation of the settled principles of *Alcoa* and *United Shoe*" is applied to "new facts," *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 457 F.Supp. at 438, the case for imposing damage liability under § 2 is far less substantial when the claimed violation is a unilateral refusal to license a patent. The exercise of that prerogative is a corollary of the explicit statutory grant of the right to exclude others from making, using, or selling the patented invention. 35 U.S.C. § 154. To deny treble damage liability for a monopolist's unilateral refusal to license patents places no limitation on the utility of the private damage action to deter any exclusionary conduct that is not grounded in the very structure of the patent laws. To impose such liability poses a threat to the progress of science and the useful arts not warranted by a reasonable accommodation of the patent and antitrust laws.

Thus, § 2, as was the case with § 1 and § 7, provides no basis for the imposition of damage liability upon Xerox for the profits SCM would have earned had it been granted plain paper copier patent licenses in January, 1969. Whether or not the jury's findings provide any basis for equita-

ble relief,[41] they are not a valid basis for damage liability with respect to SCM's 1969 exclusion claim. This conclusion makes it unnecessary to consider Xerox's further contentions that the damage evidence is too speculative even under the *Bigelow* standard, or that specific items of claimed damages, especially the award for lost net going concern value, must be disallowed, or that its defense of avoidable consequences, partially upheld by the jury, is valid.

## IV. *The MUP Marketing Claim*

The evidence disclosed that in 1967 Xerox acknowledged that it was facing competition in the marketing of its plain paper copiers from the volume discount plans (fleet plans) first offered in 1966 by the manufacturers of coated paper copiers, including SCM. Xerox was marketing a line of copiers with some models, such as the 2400 and 3600, operating at high speeds and typically used for high monthly copy volumes, and other models, such as the 914 and 813, operating at lower speeds and typically used for lower monthly copy volumes. The other companies' coated paper copiers, operating at low speeds and typically used for low monthly copy volumes, competed with Xerox's lower speed machines. Thus the fleet plans offered by the coated paper copier companies posed a threat of taking business only from Xerox's lower speed machines.

Xerox responded to its competitors' volume discounts with a volume pricing plan of its own, known as Machine Utilization Plan, or MUP, which offered a discount from Xerox's regular billing charge. Xerox typically leased its machines to customers, charging monthly minimums for the use of the machine plus a charge for each copy made. The per copy charge usually declined if large numbers of copies were made from a single document. A customer agreeing to MUP signed a contract to achieve at least a specified level of annual billing charges. Three levels were established entitling the customer to increasing discounts on his entire annual billing. The average discount was 22%. If the customer failed to have enough copy volume during the year to achieve the targeted annual billing figure, he was billed at the less favorable rate applicable to the next lower MUP annual billing level. If his annual billing fell below the lowest MUP annual billing level, he was billed at regular prices. A customer was entitled to count toward his annual MUP billing level the copies made on his Xerox machines at whatever locations the customer installed them. However, there was a minimum billing charge for each machine (above the regular leased machine use charge) to insure that customers did not lease numerous machines on which few copies were made.

The principal feature of MUP, on which SCM based its claim of antitrust violation, was the fact that the customer was entitled to use any combination of Xerox models he wished in order to meet his MUP commitment. For example, a customer with an annual MUP commitment of $1 million could qualify for the MUP rate if he incurred $1 million of billing on only high speed 3600's, or if he incurred $500,000 of billing on high speed 3600's and $500,000 of billing on high speed 2400's, or if he incurred $980,000 of billing on high speed 3600's and 2400's and $20,000 of billing on low speed 813's.

The evidence also disclosed that when Xerox first created MUP, it did not announce it to the public as an available price plan, but offered it selectively to customers who were threatening to cancel their Xerox low volume machines. The selective offering of MUP plans continued for two or three years and was replaced by general availability of the MUP pricing plan. MUP

**41.** The appropriateness of equitable relief, if any is reasonably required beyond the terms of the FTC consent decree, can best be considered after the Court of Appeals, upon the inevitable appeal from the judgment disallowing money damages, has an opportunity to determine on this fully developed record whether any violations, creating liability at least for equitable remedies, have been validly found.

was discontinued in 1975,[42] and replaced by the XCP plan, a volume discount rate applicable to a customer's aggregate billing on Xerox machines of any one model.[43]

SCM contended that MUP violated the antitrust laws in three ways. First SCM contended that MUP operated in practice as a tying arrangement in violation of § 3 of the Clayton Act, 15 U.S.C. § 14. SCM conceded that no Xerox customer was required to take a low speed machine as a condition of obtaining high speed machines at the discount rate. Nevertheless, SCM contended that in practice the effect of MUP was to coerce users of Xerox high speed machines to take some Xerox low speed machines. Second, SCM contended that Xerox employed MUP to foreclose competition or gain a competitive advantage, thereby violating § 2 of the Sherman Act. Third, SCM contended that MUP was an agreement in restraint of trade in violation of § 1 of the Sherman Act.

The jury found that MUP did have a coercive effect upon customers (Question 43) and that the effect of MUP was to tend to create a monopoly or substantially lessen competition in a relevant market or submarket (Question 44), thereby completing the elements of a § 3 violation. The jury also found that Xerox employed MUP to foreclose competition or gain a substantial competitive advantage (Question 45). Since the jury had found that Xerox had monopoly power in a relevant market as of 1969 (Question 3a), the response to Question 45 completed the elements of a § 2 violation. The jury found MUP was not an unreasonable restraint of trade (Question 47), thereby rejecting the § 1 claim.

SCM made two separate claims for damages based on MUP, a "lost placements" claim and a "pricing" claim. The "lost placements" claim was for lost profits on the placement of SCM coated paper copiers that SCM claimed it would have made but did not make because of MUP. The "pricing" claim was for the lost profits resulting from the fact that SCM charged lower prices to its large customers (K accounts) who were also MUP customers than it charged its K account customers who were not MUP customers. SCM contended that its own price differential was caused by MUP. The jury found that MUP was a proximate cause of some SCM losses attributable to lost placements (Question 52) and determined that the amount of damages on this part of the MUP claim was $230,874 (Question 53). The jury also found that MUP was not a proximate cause of any SCM losses attributable to SCM's own lower pricing to its K account customers who were also MUP customers (Question 54).

Xerox challenges the legal validity of the § 3 and § 2 determinations and the damage award. The principal attack on the violation findings is that MUP is not a tying arrangement as a matter of law. Reliance is placed on *Northern Pacific Ry. v. United States*, 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." It is undisputed that Xerox high speed machines were available at the MUP discount rate without any requirement that Xerox low speed machines also be obtained.[44]

---

**42.** Xerox agreed to discontinue MUP as part of the FTC consent decree. That fact was not presented to the jury.

**43.** SCM made no claim that XCP was a tying arrangement in violation of § 3 of the Clayton Act, but did claim that Xerox used XCP to foreclose competition or gain a substantial competitive advantage in violation of § 2. The jury rejected this contention. (Question 56).

**44.** Similarly, Xerox low speed machines were available at the MUP discount rate without any requirement that Xerox high speed machines

also be obtained. However, as is true with any volume discount, MUP was attractive only to large volume customers, and most of Xerox's high volume customers did most of their photocopy work on high speed machines. Thus MUP was attractive to many users of high speed machines. But it remained true in theory, though unlikely in practice, that any customer who anticipated using Xerox low speed machines at enough different locations to produce substantial aggregate volume could obtain the MUP discount rate by using only Xerox low speed machines.

In SCM's view the absence of a formal requirement that users of high speed machines obtain some low speed machines in order to receive the MUP discount is not decisive. SCM contends that if the economics of the situation effectively coerce a customer to take some Xerox low speed machines in order to get the MUP discount on his Xerox high speed machines, a tie has been established. Reliance is placed on *United States v. United Shoe Machinery Corp.*, 264 F. 138 (E.D.Mo.1920), *aff'd*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922), and *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969).[45] Undisputed evidence showed that about two-thirds of Xerox's MUP customers met their MUP commitment levels solely from the use of high speed machines. That left about one-third of the customers who in fact met their MUP commitment levels by a combination of high speed and low speed machine usage. Of course, some of these customers may have used Xerox low speed machines because they preferred them to competitive coated paper copiers. Nevertheless, SCM contends that some portion of these customers used Xerox low speed machines not because of product preference but because they needed to place some volume of photocopying on Xerox low speed machines in order to meet their MUP commitment level and avoid loss of the MUP discount on their entire annual billing.

The jury was instructed that "a tying arrangement results if the economic realities of the situation effectively coerce the customer into taking one product in order to get another product that he wants." (Tr. 43,997). Even if that standard is too lenient for a tying arrangement in violation of § 3 of the Clayton Act, see *Smith-Kline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978), it probably describes conduct that may be found to violate § 2 by a company that has monopoly power in a relevant market.[46] *Ibid.* Such a company

**45.** Both of these decisions must be extended somewhat to support SCM's claim. In both cases the factual contexts showed that the tying product, though available without the tied product, was not available on equally favorable terms. In this case, the allegedly tying product (high speed machine) is available on precisely the same terms, with or without the allegedly tied product (low speed machine); the factual context indicates at most that some customers feel coerced to take the low speed machines because they anticipate that their high speed machine billing will not be sufficient to qualify for the MUP discount rate, or because they are uncertain during the billing year whether their high speed billing volume will be sufficient.

**46.** There is a further problem with considering MUP a sufficiently coercive arrangement to violate either § 3 of the Clayton Act or § 2 of the Sherman Act. This appears if consideration is given to two groups of MUP customers who used Xerox low speed machines: willing users, who preferred Xerox low speed machines to competitors' machines, and unwilling users, who preferred competitors' machines, but used Xerox low speed machines to meet their MUP commitment level. The unwilling user of Xerox low speed machines can realistically be said to have been coerced by the MUP pricing plan. Of course, if he really wanted to use coated paper copiers for his low volume work, he had a free choice that would have enabled him to switch his low volume work to coated paper copiers: all he had to do was increase his volume on high speed machines until he reached his MUP commitment level. That may not have seemed to the customer to be a sensible option, since it would have meant making copies he probably did not need. However, if the multiple model usage feature of MUP is condemned under the antitrust laws, this same customer is left in exactly the same situation. Since his high speed volume does not quite entitle him to the MUP discount, and if Xerox is prohibited from permitting him to meet his MUP commitment on more than one model, then the customer must increase his high speed machine volume in order to get the MUP discount.

But what about the willing customer of Xerox low speed machines if MUP is prohibited under the antitrust laws? He would like to complete his MUP commitment by using Xerox low speed machines, because he prefers them to coated paper copiers. If Xerox cannot permit him to count low speed machine volume toward his MUP billing, then he too must make unneeded copies on his high speed machines in order to get the MUP discount. He will be coerced to do something unwanted if MUP is changed to preclude multiple model usage, whereas he is not coerced at all so long as he has the freedom to select the models on which he will meet his MUP commitment.

In addition to this anomaly, there is the undeniable fact that even if MUP had a coercive effect upon some Xerox customers, it also afforded many others a freedom of choice that would not have existed without MUP: the free-

violates § 2 when it uses its power "to gain a competitive advantage" or "to foreclose competition." *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). The jury found that MUP was used for those purposes (Question 45). Even if a § 2 violation could be found, a further issue remains whether, without testimony from a single Xerox customer that he was coerced by MUP to use Xerox low speed machines, SCM presented sufficient evidence to establish a § 2 violation.[47]

■ Even if the evidence afforded the jury a valid basis to find that MUP violated § 3 of the Clayton Act or § 2 of the Sherman Act, the damage award cannot support the entry of judgment. The jury was not given a sufficient basis from which it could reasonably conclude that the lost profits claimed by SCM were caused by MUP.

SCM estimated its damages on its MUP "lost placements" claim by examining the cancellation rates of Xerox low speed machines before and after 1967, the year MUP was introduced. The aggregate cancellation rate for all models in the 914 and 813 machine families had increased until it reached 8.4% in 1967. In the following years the aggregate cancellation rate declined. SCM assumed that if MUP had not been introduced, the cancellation rate for all Xerox lower speed machines would have remained at least as high as 8.4%. For each year after 1967, SCM started with the total number of Xerox lower speed machines placed with customers, applied to that number the assumed cancellation rate of 8.4%,

and subtracted the total number of cancellations that actually occurred to reach an estimate of the extra number of Xerox machine placements that would have been lost to all coated paper copier competitors if MUP had not been introduced. Then SCM estimated the share of these placements that SCM would have achieved for its coated paper copiers, and finally estimated that profits on such placements would have been $3,980,000.[48]

The jury award of $230,874 was indisputably based on a calculation that Xerox presented. (Deft. Ex. 11,924A). In an effort to demonstrate the implausibility of SCM's assumption that MUP caused the decline in the aggregate cancellation rates for Xerox low speed machines, Xerox analyzed the cancellation rates for each of the four models within the 914 and 813 machine families. This analysis showed that the cancellation rates for three of the models actually *increased* after the introduction of MUP, and the only decline occurred with the cancellation rate for the 813. Though Xerox contended that this circumstance, among others, demonstrated the invalidity of SCM's methodology, Xerox nevertheless calculated what SCM's lost profits would be if the SCM methodology, including all placement and profit assumptions, were applied only to the 813. Thus, Xerox assumed for the sake of argument that the 1967 cancellation rate for the 813 alone, 13.5% would continue beyond 1967, and only on that assumption calculated that SCM's methodology would produce a claim for lost profits of at most $230,874.

dom to select any one model or any combination of models of Xerox machines for the volume necessary to obtain the MUP discount.

Of course, this would not be the first paradox created by the antitrust laws, but courts should at least hesitate before condemning practices that increase a customer's freedom of choice. Perhaps it would nevertheless be appropriate to condemn MUP under the antitrust laws on the theory that any restriction on the free choice of some customers is outweighed by the assumed benefit to all customers if the absence of MUP leads to more competition between Xerox low speed machines and competitive machines, and if this competition in turn leads to lower prices.

47. Apart from the claim that MUP had a coercive effect on some users of Xerox low speed machines and thereby violated § 2 as an unlawful competitive advantage, SCM also alleged that MUP violated § 2 because it was used selectively, and not announced to the public as a generally available pricing plan. To the extent that was true, the principal injury was suffered by Xerox customers who were eligible for MUP but did not receive its benefits.

48. While SCM's methodology was based on all post-1967 cancellations of Xerox low speed machines, the Court ruled that damages for placements lost prior to January 1, 1969, were barred by the statute of limitations. (Tr. 44,-839–48).

The legal standards in this area are well-known. Once a plaintiff has shown antitrust law violation and the fact that such violation caused him injury, he is accorded considerable latitude in estimating the amount of damages. *Bigelow v. RKO Radio Pictures, Inc., supra; Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). But it is equally clear that the evidence must supply "a rational basis" for approximating the amount. *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 910 (2d Cir. 1962).

The jury in this case was not given a rational basis for approximating the amount of whatever profits SCM lost because of MUP. Both the claim that MUP caused the damage and the claim as to the amount of damage rested on the assumption that MUP caused cancellation rates to decline that otherwise would have remained at the 1967 level. Yet the undisputed evidence showed that there was no rational basis for this assumption; indeed, it showed that the assumption was not true. The cancellation rates for three of the four low speed models increased after MUP, and the rate for only one model declined. That undisputed evidence rendered irrational the plaintiff's claim that the 1967 cancellation rate was a benchmark from which to estimate damages caused by MUP.

Even if the 1967 cancellation rate for the 813 alone were a valid benchmark from which to measure damages caused by MUP, SCM's methodology provided no rational basis for the further assumption that the entire decline in cancellation rate from the 1967 level was caused by MUP. Undisputed evidence showed that after 1967 the cancellation rate for non-MUP 813 machines, as well as for MUP 813's, declined from the 1967 rate for all 813's. (Deft. Ex. 11,587A). Obviously no portion of the decline in the cancellation rate for non-MUP machines was caused by MUP. Nevertheless SCM claimed that MUP caused the entire decline from the 1967 cancellation rate for all 813's to the 1968 cancellation rate for all 813's. Since MUP could not have caused part of the decline, it is irrational to claim it caused the entire decline.[49]

In specific terms, users of 813's cancelled 4,022 fewer machines in 1968 than they had cancelled in 1967. (Deft. Ex. 11,924A). It may be that some of these machines were not cancelled because some users feared loss of entitlement to the MUP discount. However, neither SCM's methodology nor its evidence provided any basis for determining or making an estimate of what number or percent of these machines were not cancelled because of MUP.[50]

A jury is entitled to consider estimates that have a reasonable basis in the evidence. For example, after SCM claimed that all 4,022 813 machines were not cancelled because of MUP, SCM estimated what share of these machines it would have replaced and also estimated what profits it would have made on its estimated share of placements. Whatever uncertainties inhered in those estimates are permissible under the *Bigelow* standard. But SCM cannot contend that the starting point for its calculation is just another estimate within permissible bounds. The claim is for losses caused by the impact of MUP upon users of Xerox lower speed machines. It is not rational to start a damage calculation for such

---

**49.** Presumably some mix of factors caused non-MUP users of 813's to cancel in 1968 at a rate below the 1967 rate for all 813's. Similarly, some mix of factors, including MUP, presumably caused MUP users of 813's to cancel in 1968 at a rate below the 1967 rate for all 813's. Xerox's evidence suggested that among the factors causing some of the decline in the MUP 813 cancellation rate were a price increase for 813's in 1967 that raised the cancellation rate to an unusually high level and a post-1967 tendency of many customers to upgrade from Xerox 813's to Xerox 660's.

**50.** As SCM's witness in support of its MUP damage methodology conceded, "I'm quite sure that in every one of those numbers [cancellation rates for different years] there are elements that have some effect on competitive cancellation rates, but I don't have any way to separate out each of the elements." (Tr. 45,-302).

losses by assuming that MUP caused cancellation rates of such machines to go down, when in fact the cancellation rates for three of the four models of such machines went up. And it is also not rational to assume that all of the decline in the cancellation rate for 813's was caused by MUP, when in fact the rate for non-MUP 813's also declined. In the absence of any rational basis for estimating the impact of MUP upon users of 813's, SCM cannot be awarded damages on its MUP "lost placements" claim.

## V. Conclusion

As a result of the jury's factual findings rejecting many of SCM's claims for damages and the Court's conclusions of law that damage liability cannot validly be based on any of the jury's factual findings in SCM's favor, it is the ruling of this Court that Xerox is not liable to SCM for any money damages. Both sides have indicated that any ruling disposing of all damage claims should be available for appellate review before trial court consideration of any claims for equitable relief and attorney's fees. This Court agrees that in the circumstances of this litigation, sound judicial administration dictates that the present voluminous record should not be supplemented by further evidence in support of claims for any particular equitable relief until a reviewing court has had an opportunity to consider whether any liability for equitable relief has been established.

The route to appellate review, however, is not entirely clear. One possibility is entry of a final judgment, pursuant to Fed.R. Civ.P. 54(b), "as to one or more but fewer than all of the claims . . . ." SCM's claims based on antitrust violation are clearly distinct from the severed Xerox claims of patent infringement and the SCM defense of patent invalidity.[51] Disposition of the antitrust claims would be sufficient for a Rule 54(b) judgment, and some of those claims have been finally adjudicated. Nothing further remains for consideration with respect to the 1964 exclusion claim, the Fuji-Xerox 2200 claim, the MUP and XCP marketing claims, and the 6740 marketing claim.[52] As to the 1969 exclusion claim, however, there is substantial doubt whether a denial of damages can support a final judgment on that claim as long as the possibility of equitable relief remains open. See *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n. 4, 96 S.Ct. 1202, 47 L.Ed.2d 43 (1976); *Acha v. Beame*, 570 F.2d 57 (2d Cir. 1978); *Aetna Casualty & Surety Co. v. Giesow*, 412 F.2d 468 (2d Cir. 1969). However, the Second Circuit has indicated that in some circumstances a claim for a particular remedy, attorney's fees, may involve facts sufficiently distinct from the facts underlying a compensatory damage claim to warrant entry of a final judgment on the damage claim. See *Cinerama, Inc. v. Sweet Music, S.A.*, 482 F.2d 66, 70 n. 2 (2d Cir. 1973). Therefore, since the "no just reason for delay" standard of Rule 54(b) is plainly met in this case, it seems appropriate to direct the Clerk to enter judgment in favor of Xerox with respect to the 1964 exclusion claim, the Fuji-Xerox 2200 claim, the MUP and XCP marketing claims, and the 6740 marketing claim, and also to enter judgment for Xerox with respect to all of SCM's claims for damages with respect to the 1969 exclusion claim.

If rejection of all the damage claims with respect to the 1969 exclusion claim will not support a final judgment, pursuant to Rule 54(b), then a second possible route to appellate review is certification under 28 U.S.C.

---

**51.** SCM's defense to the infringement claim based on patent misuse was not severed from the antitrust claims, since that defense raises the identical issues raised by the antitrust claims. It will be time enough to consider whether any Xerox conduct warrants withholding of infringement remedies after appellate review of the rulings made herein, in the event the infringement claims are pursued.

**52.** The jury's findings rejected all of these claims, except the MUP marketing claim, thereby eliminating any possible claim for equitable remedies. As to the MUP marketing claim, even if a violation occurred, the abandonment of the plan pursuant to the FTC decree, *see* note 42, *supra*, eliminates any possible claim for an equitable remedy.

§ 1292(b). The rejection of SCM's damage claims with respect to the 1969 exclusion claim involves several controlling questions of law as to which, for lack of precedent, there is substantial ground for difference of opinion, and it is clear that immediate appeal from the ruling disallowing such damages will materially advance the ultimate termination of this litigation. To whatever extent a reviewing court may conclude that the dismissal of SCM's claim for money damages on its 1969 exclusion claim and the dismissal of all its other antitrust claims lack finality, the rulings dismissing such claims on the merits are hereby certified for appellate review pursuant to 28 U.S.C. § 1292(b).[53]

### APPENDIX A *

### I. RELEVANT MARKET

1. As of January, 1964, did there exist a relevant market, as alleged by SCM, consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes _____
No ___X___

2. As of January, 1964, did there exist a relevant market or a relevant sub-market, as alleged by SCM, consisting only of "convenience office copiers" using only *plain* paper?

Yes _____
No ___X___

1a. As of January, 1969, did there exist a relevant market, as alleged by SCM, consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes ___X___
No _____

2a. As of January, 1969, did there exist a relevant market or a relevant sub-market, as alleged by SCM, consisting only of "convenience office copiers" using only *plain* paper?

Yes ___X___
No _____

### II. 1964 EXCLUSION CLAIM

#### D. *Competitive Status*

12. In 1956 when Rank-Xerox was formed, were Xerox and the Rank Organisation potential competitors?

Yes _____
No ___X___

13. In 1960 when Fuji-Xerox was formed, was Fuji Photo Film a potential competitor of either Xerox or Rank-Xerox?

Yes ___X___
No _____

14. As of January, 1964, were Xerox, Rank-Xerox, and Fuji-Xerox potential competitors?

Yes _____
No ___X___

#### E. *Section 1—Unreasonable Restraint of Trade*

15. As of January, 1964, was the 1956 Xerox-Battelle agreement an unreasonable restraint of trade?

Yes ___X___
No _____

---

**53.** Surely the record has been sufficiently developed to avoid an obstacle to § 1292(b) review encountered in other circumstances. *See Gottesman v. General Motors Corp., supra,* 414 F.2d at 958.

If the Court of Appeals should conclude that any issue of fact necessary for decision of any issue of law in this case was submitted to the jury under a prejudicially incorrect legal standard or was otherwise improperly determined, it is respectfully suggested that the Court consider the appropriateness of subsequent district court fact-finding on such issue, without a jury, either on the present record, or with such additions or deletions as the Court of Appeals may order in light of its consideration of evidentiary rulings. *See Memorex Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D.Cal.1978) (court fact-finding

after jury disagreement in complex case); *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59 (S.D.N.Y.1978) (jury disallowed in complex case); *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702 (S.D.Cal.1977) (same); *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99 (W.D.Wash.1976) (same).

* This appendix includes only the questions answered by the jury. Some questions were withdrawn, and others were to be answered only if a preceding question had been answered "yes." Each question indicated which party had the burden of proof and whether the question was to be answered only if preceded by a "yes" answer to one or more previous questions.

16. As of January, 1964, was there an agreement, combination or conspiracy among Xerox and Battelle, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox, or some of them, to deny to others licenses to use plain paper copier patents throughout the world including licenses to use Xerox's plain paper copier patents in the United States?

Yes _____ (If you answer "yes," circle each company you find was a party to the agreement.)

No __X__

18. As of January, 1964, was there an agreement, combination or conspiracy among Xerox and Battelle, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox, or some of them, to exclude other companies from the manufacturing and marketing of plain paper copiers throughout the world?

Yes _____ (If you answer "yes," circle each company you find was a party to the agreement.)

No __X__

F. *Section 7—Unlawful Acquisitions*

20. Was the probable effect of Xerox's acquisition of patents pursuant to the 1956 Xerox-Battelle agreement, when the agreement was made, substantially to lessen competition or to tend to create a monopoly in any relevant market or sub-market that you have found to exist?

(Check whatever market or sub-market, if any, you have found to exist and then answer this question only as to such market or sub-market, or both):

__X__ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes __X__

No _____

__X__ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes __X__

No _____

21. As of January, 1964, was the probable effect of Xerox's continued holding of patents acquired pursuant to the 1956 Xerox-Battelle agreement substantially to lessen competition or to tend to create a monopoly in any relevant market or sub-market that you have found to exist?

(Check whatever market or sub-market, if any, you have found to exist and then answer this question only as to such market or sub-market, or both):

__X__ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes __X__

No _____

__X__ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes __X__

No _____

G. *Proximate Cause and Injury to SCM*

22. As of January, 1964, did SCM have the intention, preparedness, and capability to enter into the development, manufacturing, and marketing of plain paper office copiers?

Yes _____

No __X__

30.* Would SCM have earned any cumulative profits from 1964 to 1976, (a) assuming that SCM entered into the development, manufacturing, and marketing of plain paper copiers in January, 1964, and (b) assuming that SCM did not stop its plain

* The reference to the Glidden merger in Questions 30 and 31 resulted from Xerox's contentions concerning SCM's 1967 acqustion

of the Glidden Co. Xerox contended that SCM would not have been able or willing to continue a plain paper copying venture and to

paper copier program at the time of the Glidden merger?

Yes   X

No   _____

31.** Would SCM have earned any profits *in 1976 alone,* (a) assuming that SCM entered into the development, manufacturing, and marketing of plain paper office copiers in January, 1964, and (b) assuming that SCM did not stop its plain paper copier program at the time of the Glidden merger?

Yes   _____

No   X

33. If SCM has suffered any damages because Xerox excluded SCM from entering into the development, manufacturing, and marketing of plain paper office copiers in January, 1964, or January, 1969, or both, should SCM *reasonably* have avoided such damages by developing, manufacturing, and marketing plain paper office copiers *without* licenses from Xerox to use Xerox's plain paper office copier patents?

Yes   _____

No   X

34. If SCM has suffered any damages because Xerox excluded SCM from entering into the development, manufacturing, and marketing of plain paper office copiers in January, 1964, or January, 1969, or both, should SCM *reasonably* have avoided such damages by continuing the 1964 lawsuit against Xerox to attack the enforceability of Xerox's plain paper copier patent licenses or by bringing a new lawsuit against Xerox

in 1964 to obtain licenses from Xerox to use Xerox's plain paper copier patents?

Yes   X

No   _____

35. Was it possible prior to March 11, 1969, to make a commercially reliable xerographic plain paper copier without infringing the Carlson '699 corona charging patent?

Yes   _____

No   X

### III. 1969 EXCLUSION CLAIM

A. *Section 2—Actual Monopolization*

3a. As of January, 1969, did Xerox have monopoly power, that is, the power to control prices or exclude competition, in any relevant market or sub-market you have found to exist?

(Check whatever market or sub-market, if any, you have found to exist as of January, 1969, and then answer this question only as to such market or sub-market, or both):

  X   In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes   X

No   _____

  X   In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes   X

No   _____

4a. As of January, 1969, did Xerox willfully acquire or maintain monopoly power in any relevant market or sub-market you have found to exist by conduct *other than* obtaining and exercising lawful patent power?

(Check whatever market or sub-market, if any, you have found to exist as of January,

---

acquire Glidden, and would therefore either have ended the plain paper copier venture and pursued the Glidden opportunity or continued with plain paper copying and passed up the Glidden opportunity. Xerox further contended that SCM made more profits from the Glidden merger than it would have made in plain paper copying and was therefore not damaged even if excluded from plain paper copying in 1964. Questions 30 and 31 were framed to elicit jury fact-finding on SCM's profits under the 1964

exclusion claim in the event these Xerox contentions were legally insufficient.

** The jury was asked whether SCM would have earned profits in 1976 alone under the 1964 exclusion claim and under the 1969 exclusion claim (Questions 31a and 51) to provide a basis for computation of SCM's claim for net lost going conern value (Question 61), which involved a capitalization of 1976 profits from which was subtracted total investment.

1969, and then answer this question only as to such market or sub-market, or both):

___X___ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes ___X___

No _____

___X___ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes ___X___

No _____

5a. By January, 1969, did Xerox obtain patents from the United States Patent Office primarily for the purpose of blocking the development and marketing of competitive products rather than primarily to protect its own products from being imitated or blocked by others?

Yes _____

No ___X___

**B.** *Section 2—Attempted Monopolization*

6a. As of January, 1969, did Xerox attempt to obtain monopoly power, that is, the power to control prices or exclude competition, in any relevant market you have found to exist by conduct *other than* obtaining or exercising lawful patent power?

(Check whatever market or sub-market, if any, you have found to exist as of January, 1969, and then answer this question only as to such market or sub-market, or both):

___X___ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes ___X___

No _____

___X___ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes ___X___

No _____

7a. As of January, 1969, did Xerox have a specific intent to monopolize, that is, to acquire or maintain monopoly power in, any relevant market or sub-market you have found to exist by conduct *other than* obtaining or exercising lawful patent power?

(Check whatever market or sub-market, if any, you have found to exist as of January, 1969, and then answer this question only as to such market or sub-market, or both):

___X___ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes _____

No ___X___

___X___ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes _____

No ___X___

**C.** *Section 2—Conspiracy to Monopolize*

9a. As of January, 1969, was there a combination or conspiracy among Xerox, Battelle, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox, or any of them, to monopolize, that is, to acquire or maintain monopoly power in, any relevant market or sub-market that you have found to exist by conduct *other than* obtaining or exercising lawful patent power?

___X___ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes ___X___ (If you answer "yes," circle each company you find was a member of the conspiracy.)

No _____

___X___ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes ___X___ (If you answer "yes," circle each company you find was a member of the conspiracy.)

No _____

(The jury circled Xerox, Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox.)

10a. By January, 1969, did Xerox join the conspiracy described in Question 9a with the specific intent to acquire or main-

tain monopoly power in any relevant market or sub-market that you have found to exist by conduct *other than* obtaining or exercising lawful patent power?

(Check whatever market or sub-market, if any, you have found to exist as of January, 1969, and then answer this question only as to such market or sub-market, or both):

__X__ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes _____
No __X__

__X__ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes _____
No __X__

### D. *Competitive Status*

14a. As of January, 1969, were Xerox, Rank-Xerox, and Fuji-Xerox potential competitors?

Yes _____
No __X__

### E. *Section 1—Unreasonable Restraint of Trade*

15a. As of January, 1969, was the 1956 Xerox-Battelle agreement an unreasonable restraint of trade?

Yes __X__
No _____

16a. As of January, 1969, was there an agreement, combination or conspiracy among Xerox and Battelle, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox, or some of them, to deny to others licenses to use plain paper copier patents throughout the world including licenses to use Xerox's plain paper copier patents in the United States?

Yes _____ (If you answer "yes," circle each company you find was a party to the agreement.)
No __X__

18a. As of January, 1969, was there an agreement, combination or conspiracy among Xerox and Battelle, the Rank Organisation, Rank-Xerox, Fuji Photo Film, and Fuji-Xerox, or some of them, to exclude other companies from the manufacturing and marketing of plain paper copiers throughout the world?

Yes _____ (If you answer "yes," circle each company you find was a party to the agreement.)
No __X__

### F. *Section 7—Unlawful Acquisitions*

21a. As of January, 1969, was the probable effect of Xerox's continued holding of patents acquired pursuant to the 1956 Xerox-Battelle agreement substantially to lessen competition or to tend to create a monopoly in any relevant market or sub-market that you have found to exist?

(Check whatever market or sub-market, if any, you have found to exist as of January, 1969, and then answer this question only as to such market or sub-market, or both):

__X__ In a market consisting only of "convenience office copiers" using both *plain and coated* paper?

Yes __X__
No _____

__X__ In a market or sub-market consisting only of "convenience office copiers" using only *plain* paper?

Yes __X__
No _____

### G. *Proximate Cause and Injury to SCM*

22a. As of January, 1969, did SCM have the intention, preparedness, and capability to enter into the development, manufacturing, and marketing of plain paper office copiers?

Yes __X__
No _____

23a. Prior to January, 1969, did Xerox engage in any conduct, *other than* obtaining or exercising lawful patent power, that had any tendency to exclude others from plain paper copying?

Yes __X__
No _____

24a. Prior to January, 1969, did Xerox engage in any exclusionary conduct that included patent-related conduct, *other than* obtaining or exercising lawful patent power, that was a proximate cause of SCM's not entering into plain paper copying in January, 1969?

Yes __X__
No _____

24a–1. Please list or briefly describe whatever patent-related exclusionary conduct of Xerox, other than obtaining or exercising lawful patent power, you have found, in answering "yes" to question 24a, was a proximate cause of SCM's not entering into plain paper copying in January, 1969:

Answer: 1956 Battelle Agreement

27a. Was the 1956 Xerox-Battelle agreement or the acquisition by Xerox of patents pursuant to that agreement a proximate cause of SCM's not entering into plain paper copying in January, 1969?

Yes __X__
No _____

27a–1. Is your "yes" answer to question 27a the sole basis for your "yes" answers to questions 23a and 24a?

Yes _____
No __X__

30a. Would SCM have earned any cumulative profits from 1969 to 1976, assuming that SCM entered into the development, manufacturing, and marketing of plain paper copiers in January, 1969?

Yes __X__
No _____

31a. Would SCM have earned any profits *in 1976 alone,* assuming that SCM entered into the development, manufacturing, and marketing of plain paper office copiers in January, 1969?

Yes __X__
No _____

32a. Was SCM's not entering into plain paper copying in January, 1969, a proxi-

mate cause of any of SCM's losses in *coated paper* copying?

Yes _____
No __X__

## IV. FUJI-XEROX 2200 CLAIM

38. Did Xerox and Fuji-Xerox, by themselves or together with others, enter into any agreement or conspiracy pursuant to which Fuji-Xerox was prevented from marketing the Fuji-Xerox 2200 in the United States?

Yes _____
No __X__

41. Did SCM have the intention, preparedness, and capability to market the 2200 in the United States?

Yes _____
No __X__

## V. MUP PRICING CLAIM

43. Under the MUP pricing plan, were the MUP customers of Xerox coerced into taking low volume or low speed Xerox office copiers instead of the office copiers manufactured by other companies?

Yes __X__
No _____

44. Was the effect of the MUP pricing plan to tend to create a monopoly or substantially to lessen competition in a relevant market or sub-market?

Yes __X__
No _____

45. Did Xerox employ its MUP pricing plan to foreclose competition or gain a substantial competitive advantage?

Yes __X__
No _____

47. Were the MUP and XCP pricing agreements between Xerox and its MUP and XCP customers unreasonable restraints of trade?

Yes _____
No __X__

## VI. 6740 CLAIM

48. Were any Xerox marketing practices that could reasonably be expected to injure SCM's efforts to market its 6740 plain paper copier used by Xerox to foreclose com-

petition or gain a substantial competitive advantage?

Yes _____

No __X__

(End of first stage of jury's deliberations)

50. What amount of damages, if any, proximately caused by SCM's exclusion from plain paper copying in January, 1969, do you find SCM is entitled to for cumulative profits not earned during the period from January 1, 1969, to December 31, 1976?

$11.5 million

51. What amount of profits, if any, do you find SCM would have earned during the year 1976 alone if it had not been excluded from plain paper copying in January, 1969?

$23.6 million

52. Was Xerox's MUP pricing plan a proximate cause of SCM's incurring losses by not placing some coated paper copiers?

Yes __X__

No _____

53. What amount of damages, if any, proximately caused by Xerox's MUP pricing plan, do you find SCM is entitled to for losses incurred by not placing some coated paper copiers?

$230,874.00

54. Was Xerox's MUP pricing plan a proximate cause of SCM's incurring losses by charging lower prices for coated paper copiers to SCM's MUP K account customers than to SCM's non-MUP K account customers?

Yes _____

No __X__

56. Did Xerox employ its XCP pricing plan to foreclose competition or gain a substantial competitive advantage?

Yes _____

No __X__

59. Was SCM's exclusion from plain paper copying in January, 1969, a proximate cause of any of SCM's 6740 losses?

Yes _____

No __X__

(End of second stage of jury's deliberations)

61. What amount of damages, if any, proximately caused by SCM's exclusion from plain paper copying in January, 1969, do you find SCM is entitled to for loss of net going concern value as of December 31, 1976?

$25.6 million